# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 13, 2016          Decided December 20, 2016

No. 14-1074

PUBLIC SERVICE COMPANY OF NEW MEXICO,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 14-1122

———

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

———

*Robin A. Goble* argued the cause and filed the briefs for petitioner.

*Micah Jost*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Robert J. Englehart*, Supervisory Attorney, and *Douglas Callahan*, Attorney.

Before: HENDERSON and ROGERS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:  The Public Service Company of New Mexico petitions for review of the decision and order of the National Labor Relations Board that it violated Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5).  The company challenges three Board rulings, involving the company's failure to provide the Union with requested information, its unilateral changes to the grievance procedure under the parties' collective bargaining agreement ("CBA"), and its failure to process a discrimination complaint as a grievance.  For the following reasons, we deny the petition and grant the Board's cross-application for enforcement of its order.

**I.**

Sections 8(a)(1) and (5) of the National Labor Relations Act ("the Act") prohibit unfair labor practices by an employer. 29 U.S.C. § 158(a)(1), (5).  Section 8(a)(1) provides that it is unlawful for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights" guaranteed in Section 7 of the Act.  29 U.S.C. § 158(a)(1).  Section 8(a)(5) prohibits an employer from "refus[ing] to bargain collectively" with its employees' chosen representative.  29 U.S.C. § 158(a)(5).  "An employer who violates section 8(a)(5) also, derivatively, violates section 8(a)(1)."  *Exxon Chem. Co. v. NLRB*, 386 F.3d 1160, 1164 (D.C. Cir. 2004).

The company is a New Mexico corporation that purchases, produces, transmits, and sells electricity. Of its 1,800 employees, approximately 635 belong to the International

Brotherhood of Electrical Workers, Local Union No. 611, AFL-CIO ("the Union"), which, since the 1970s, has represented a multi-facility bargaining unit of employees in the Electric, Water, Transmission, Distribution, Production, Meter Reader, and Collector departments.  Between 2010 and 2011, the Union filed unfair labor practice charges due to the company's frustrating and impeding the Union's ability to represent employees.  In 2011, the Board found that the company violated Sections 8(a)(1) and (5) of the Act by refusing to furnish the Union with requested information "relevant to its representative function." *Pub. Serv. Co. of N.M.* ("*2011 PNM*"), 356 NLRB 1275, 1279 (2011), *enforced*, 692 F.3d 1068 (10th Cir. 2012).  In 2014, the Board found the company committed similar and other violations of the Act, *Pub. Serv. Co. of N.M.* ("*2014 PNM*"), 360 NLRB No. 45 (2014), and the company petitions for review.

**A.**

The company challenges three instances in which the Board found that it unlawfully refused to provide the Union with requested information.  Each request was for information about non-unit employees in connection with pending grievances filed by the Union alleging disparate treatment of unit and non-unit employees under company-wide polices.  In one instance, unit employee Marie Plant had been informed by her supervisor that to be absent for a medical appointment she would need to provide a doctor's note because she had a low paid time off ("PTO") balance.  The Union requested the company provide information on the number of medical appointments for unit and non-unit employees that were scheduled and approved by supervisors, and the names of the employees who were required to provide a doctor's note to verify a medical appointment.   In a second instance, unit employee Robert Madrid was fired after the company claimed he violated state law and the company's *Do the Right Thing* policy by disconnecting a gas line, resulting

in a leak. The Union, alleging the supervisors were "aware of [the] misconduct and had ample time to investigate and administer discipline if required," 356 NLRB at 1277; E-mail from Ed Tafoya to Cindy Castro (Jan. 7, 2011), requested the company provide information about the discipline (if any) issued to supervisors Dave Delorenzo, Kelly Bouska, and Rex Foss for their involvement in the gas leak incident. The request as to Delorenzo and Bouska was resolved against the company in the *2011 PNM* decision; only the request as to Foss is at issue. Finally, a third instance also involved the termination of a unit employee, this time for failing to comply with the company's Employee Safety Manual. The Union requested the company provide a list of unit and non-unit employees who had been disciplined or discharged for violating the Employee Safety Manual or other established safety procedures.

The Board adopted the recommendation of the Administrative Law Judge ("ALJ") that the refusals to provide the requested information, in connection with the pending grievances alleging disparate treatment, violated the Act because employers must furnish requested information concerning the discipline of non-unit employees under company rules that apply to all employees. *2014 PNM* 1 (referencing ALJ Dec. 43, 44, 46).

**B.**

In 2011, the company unilaterally implemented three changes to the initial "Informal Step" of the grievance process under the CBA: (1) more than one supervisor was required to be present during the initial meetings; (2) supervisors would proceed with the oral discussion only after union stewards described the grievance with particularity; and (3) supervisors would not sign for receipt of the written grievances after meeting with the stewards.

The Board found that the CBA confirmed that having more than one supervisor present was a change because it refers to only "the immediate supervisor of the grievant" being present at the grievance process's initial meetings. *Id.* at 2–3. That change was unlawful, the Board concluded, because, "in conjunction with the other two unlawful changes, it created a new tier in the informal step, further complicating grievance processing." *Id.* at 3. "[W]hat was once an informal discussion between the steward and the supervisor is now a more formal and protracted affair." *Id.* (quoting ALJ Dec. 15). A majority of the Board concluded that "all three of these changes to longstanding practices created unprecedented procedural hurdles and clearly impeded the processing of grievances." *Id.*

## C.

Eric Cox, a company employee and union steward for six years, filed a complaint with the Human Resources Department alleging discrimination based on race and union activity. He requested that union agent Ed Tafoya be his union representative during the internal investigation and proceeding. The company bifurcated the complaint into separate racial discrimination and union animus investigations, and informed Cox that Tafoya could neither be his representative nor testify in connection with the racial discrimination complaint.

The Board concluded that regardless of whether the parties characterized the complaint as a "grievance" under Article 10 of the CBA, the company violated Section 8(a)(1) of the Act by denying Cox his statutory right to a union representative of his choice and by refusing to meet with the Union and Cox regarding the racial discrimination complaint, which was covered by Article 8 of the CBA. *2014 PNM* 1 & n.6.

**II.**

In responding to the company's petition for review, the court proceeds on the basis that the Board's factual findings are conclusive if supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). Under this standard, "the Board is to be reversed only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1072 (D.C. Cir. 2016) (citing *Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015)). The court "owe[s] substantial deference to inferences drawn from the facts . . . and, overall, to the reasoned exercise of the Board's expert judgment." *Avecor, Inc. v. NLRB*, 931 F.2d 924, 928 (D.C. Cir. 1991) (citations and quotations omitted). This deference extends to the Board's interpretation of its precedent. *Ceridian Corp. v. NLRB*, 435 F.3d 352, 355 (D.C. Cir. 2006).

Because Congress has determined that the Board has "the primary responsibility of marking out the scope . . . of the statutory duty to bargain," *Ford Motor Co. v. NLRB*, 441 U.S. 488, 496 (1979), "great deference" is due to the Board's determinations of the scope of an employer's obligation to provide requested information to a union and of the unilateral change doctrine, as both derive from the statutory duty to bargain. *Crowley Marine Servs., Inc. v. NLRB*, 234 F.3d 1295, 1297 (D.C. Cir. 2000) (quotation omitted); *see also Ford Motor Co.*, 441 U.S. at 496. On the other hand, the court reviews the Board's interpretation of collective bargaining agreements *de novo*. *Util. Workers Union of Am., Local 246 v. NLRB*, 39 F.3d 1210, 1216 (D.C. Cir. 1994).

**A.**

"There can be no question of the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties." *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435–36 (1967). So long as the information is "relevant to the union's representational functions," the employer is obligated to provide it upon request. *Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*, 711 F.2d 348, 357 (D.C. Cir. 1983); *see N.Y. & Presbyterian Hosp. v. NLRB*, 649 F.3d 723, 729 (D.C. Cir. 2011). This standard is in keeping with the observation in *Acme Industrial Co.* that a "liberal standard as to relevancy" decreases the burdens and expense of resolving labor conflicts by providing the union with an opportunity to evaluate the merits of a claim without forcing it to "take a grievance all the way through to arbitration." 385 U.S. at 437 n.6*,* 438.

The company contends that the Board departed from well-settled precedent in finding that it violated Section 8(a)(5) and (1) in three instances when it denied Union requests for information about non-unit employees. Maintaining that "[a] union's bare assertion" it needs such information does not oblige the employer to provide it, Pet'r's Br. 28 (citing *N.Y. & Presbyterian Hosp.*, 649 F.3d at 730), the company points to the Board's discovery-type standard under which the company is required to provide requested information only if the information is of probable or potential relevance, *id.* at 28 (citing *N.Y. & Presbyterian Hosp.*, 649 F.3d at 730). Because information regarding non-unit employees is not presumptively relevant, *see Oil, Chem. & Atomic Workers*, 711 F.2d at 359, a union must demonstrate "a reasonable belief, supported by objective evidence, that the requested information is relevant," Pet'r's Br. 28–29 (quoting *Disneyland Park & Disney's Cal. Adventure*, 350 NLRB 1257, 1257–58 (2007)), which the company maintains requires evidence "external to its own

subjective impressions," *id.* at 29 (quoting *NLRB v. B.A. Mullican Lumber & Mfg. Co.*, 535 F.3d 271, 280 (4th Cir. 2008)). The company asserts that the Union neither presented "sensory observations" nor conducted an investigation that had given rise to a reasonable suspicion of disparate treatment, and therefore was not entitled to receive the requested non-unit employee information. *Id.* at 31–32.

The company appears to view the Board to have ruled that the requested information was relevant solely because the information related to employee-wide policies. *E.g.*, Pet'r's Br. 30, 31. This ignores that the Board's determination was made in the context of pending grievances alleging disparate treatment of unit and non-unit employees under company-wide policies, as its cited precedent underscored. It cited *2011 PNM*, where the company's refusal to provide information about supervisors Delorenzo and Bouska violated the Act because the information concerned policies "equally applicable to each of [the company's] bargaining unit and non-bargaining unit employees" and was "necessary . . . for the Union's processing of a [disparate treatment] grievance." 356 NLRB at 1279, 1280. It also cited *Postal Service*, 310 NLRB 391 (1993), where the Service's refusal to provide information about two non-unit employees whom witnesses claimed had routinely been late for work violated the Act because the request was connected to a grievance filed on behalf of a unit employee disciplined for tardiness. The Board ruled the requested information was relevant "[b]ecause supervisors and employees were subject to the same time and attendance rules, [and] information that supervisors were tardy arguably could show disparate treatment which would be of use to the Union in processing the employees' grievances." *Id.* at 392. And the Board cited *Postal Service*, 301 NLRB 709 (1991), where the requested information about supervisory discipline was deemed relevant because the information concerned the Service's policies that "appl[ied]

equally to supervisors and unit employees," and was "necessary to the Union's [pending grievance] to show that [a unit member] was treated in a disparate manner." 301 NLRB 709, 711 (1991).

To the extent the company maintains the Union was engaged in a "classic fishing expedition" because it presented no evidence to demonstrate "reasonable suspicion that disparate treatment had occurred," Pet'r's Br. 31, the company's reliance on *B.A. Mullican Lumber & Mfg. Co.*, 535 F.3d 271, is misplaced. That case addressed the standard for an employer to withdraw recognition of a union, *id.* at 277, and did not assess the relevance of requested non-unit employee information. The Board has long rejected the company's approach. In *Holiday Inn on the Bay*, 317 NLRB 479 (1995), the Board explained that a union is not required to have evidence of disparate treatment in order to be entitled to receive information relating to that disparate treatment. There, after filing a grievance alleging disparate treatment of non-unit employees who were terminated for leaving a cash register unattended, the union requested "all [disciplinary] documents issued to front desk personnel Union and nonunion for similar infractions from January 1993 forward." *Id.* at 480. The Board ruled the employer's refusal to provide the information violated Sections 8(a)(1) and (5). "[C]omparative discipline is one area where information pertaining to nonunit employees, . . . [is] necessary to performance of the [union's] function" and would "provide the Union with a basis . . . that [unit employees] had been harshly, unjustly or disparately treated." *Id.* at 481 (internal citation omitted). Similarly, in *Postal Service*, 289 NLRB 942 (1988), the Board ruled the union was entitled to receive requested information about the discipline of supervisors accused of gambling "because the gambling prohibition . . . applie[d] to both" unit and non-unit employees and the union had filed a grievance alleging that unit employees were "disparately treated" under that policy. *Id.* at 943. Earlier still, the Board

explained "[i]t is not necessary, as [the employer] appears to suggest, that the Union demonstrate actual instances of contractual violations before [the employer] must supply information." *Doubarn Sheet Metal, Inc.*, 243 NLRB 821, 824 (1979).

The company relies primarily on the 1993 *Postal Service* case where the Board stated that "the burden of demonstrating relevance is not carried by a showing of a common disciplinary standard and a mere suspicion that there may exist some evidence of supervisory misconduct similar to that involved in the grievance." 310 NLRB at 702 (citation and quotation omitted). The context of the Board's statement limits its applicability, however. There, a "class action grievance" had been filed after a unit member received a notice of removal "for failure to report to work as scheduled," *id.* at 701, 702, and the union requested the leave records of nineteen supervisors and records of any disciplinary actions taken against them for leave abuse. *Id.* at 702. Unlike the unit employee who was disciplined for "five instances of unexcused day-long absences," *id.* at 702, there was no basis to believe these supervisors had violated the company's leave policy, and it was therefore not readily apparent that the supervisors were similarly situated to the grievant. The Board stated the union must show something more than a "mere suspicion" the supervisors engaged in tardiness or absenteeism. *Id.* at 702. Because the union adduced only statements of unnamed union members that they had observed "prolonged absences" by these supervisors, the Board dismissed the allegation. *Id.* at 703.

By contrast, here, the Union did more than present a "bare assertion that it needs information to process a grievance." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 314 (1979). It tied its requests to company-wide polices and requested information about non-unit employees who were similarly situated to the

unit employee in an attempt to determine whether, as the grievances alleged, there had been disparate treatment by the company based on union membership. The Union neither sought information about non-unit employees for whom the company had not applied its policy nor sought information that would disclose extraneous information, such as the application of different policies not grieved. The Board had no occasion to determine whether each of these circumstances was necessary to establish relevance for non-unit information. But the Board's ruling that the company's failure to provide the requested information violated the Act was supported by well-established Board precedent.

**B.**

An employee grievance procedure is a "mandatory subject[] of bargaining" under Section 8(a)(5) of the Act. *St. Agnes Med. Ctr. v. NLRB*, 871 F.2d 137, 145 (D.C. Cir. 1989) (citing *Ind. & Mich. Elec. Co.*, 284 NLRB 53 (1987)); 29 U.S.C. § 158(a)(5). Section 8(d) of the Act describes the duty to bargain as the mutual obligation to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment. An employer violates Section 8(a)(5) where, in the absence of a final agreement or impasse, the employer "unilaterally imposes changes in the terms and conditions of employment," *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 347 (D.C. Cir. 2011) (quoting *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1113 (D.C. Cir. 2001)), when those changes are "material, substantial, and significant," *S. Nuclear Operating Co. v. NLRB*, 524 F.3d 1350, 1357 (D.C. Cir. 2008) (quoting *Alamo Cement Co.*, 281 NLRB 737, 738 (1986)). Such unilateral changes derivatively violate Section 8(a)(1). 29 U.S.C. § 158(a)(1); *see Wayneview Care Ctr.*, 664 F.3d at 347 n.1 (quotation omitted).

The company contends that it was entitled, without bargaining with the Union, to implement the three changes to the Informal Step of the grievance process — requiring a second supervisor to attend the initial meetings, requiring grievances to be described with particularity prior to any oral discussions, and instructing supervisors not to sign for receipt of written grievances after meeting with union stewards. Challenging the Board's interpretation of the CBA and the Board's findings on the parties' past and present practices, the company maintains that rather than "hid[ing] the ball until after oral discussions break down," a plain reading of Article 10 of the CBA envisions a meaningful interactive process during the Informal Step and requires the grievance to be explained with particularity at the outset. Pet'r's Br. 35. To the extent a second supervisor's presence was a change, the company maintains it was not material, substantial, and significant because no evidence showed the change delayed or prevented a grievance from being addressed. *Id.* at 38–39. The company takes the same position with regard to its two other changes, *id.* at 39, and it maintains the Board improperly lumped together unrelated events in concluding the changes were material, substantial, and significant, *id.* at 40.

Article 10 of the CBA sets forth a three-step grievance process. The initial "Informal Step" involves a meeting between the employee, the employee's immediate supervisor, and a union steward if the employee requests one. The parties are to "attempt to adjust the grievance informally." If the grievance is not adjusted to the satisfaction of the grievant after an oral discussion, the grievance "shall be reduced to writing, on appropriate forms," where it must include a statement of the grievance and identify the CBA provision at issue, all involved employees, and the remedy sought. Article 10 does not expressly state whether the formalities associated with written grievances also apply to the initial oral discussions. The

company's interpretation that the formalities apply to both may be plausible, but the Informal Step is "reasonably susceptible of different constructions or interpretations." *Ameren Servs. Co. v. FERC*, 330 F.3d 494, 499 (D.C. Cir. 2003) (quoting *Consol. Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1544 (D.C. Cir. 1985)). The sequencing contemplated by Article 10 — the grievance "shall first [be] take[n] up . . . orally" and is "reduced to writing" if it "is not adjusted to the satisfaction of the grievant," — is reasonably understood to impose different, more demanding formalities for a written grievance than for the initial oral meetings. Under the circumstances, "[a]n employer's 'past practice' can become 'clearly established as a term and condition of employment' subject to the duty to bargain." *Int'l Bhd. of Elec. Workers Local 1466 v. NLRB*, 795 F.2d 150, 153 (D.C. Cir. 1986) (quoting *Office & Prof'l Emps. Int'l Union, Local 425 v. NLRB*, 419 F.2d 314, 321 (D.C. Cir. 1969)).[1]

The Board's finding that the parties had a longstanding practice of conducting the Informal Step with a high degree of informality is supported by substantial evidence. *2014 PNM* 2. The parties' history indicates that at the outset of the grievance process, a single supervisor met with the employee and a union steward to discuss the grievance and determine whether it could be satisfactorily resolved. Various witnesses, including a company director, described the Informal Step as beginning by simply "talk[ing] through" the issue. Tr. 595 (Nov. 17, 2011); *see* Tr. 162 (Nov. 15, 2011); Tr. 221 (Nov. 16, 2011); Tr. 926–29 (Jan. 18, 2012); Tr. 1035, 1058 (Jan. 19, 2012).

---

[1] The company never suggested to the Board that it should have deferred ruling on the contract questions until they had first been pursued by the Union pursuant to the CBA's grievance and arbitration procedures. *See, e.g.*, *Hammontree v. NLRB*, 925 F.2d 1486 (D.C. Cir. 1991); *Collyer Insulated Wire*, 192 NLRB 837 (1971). We express no opinion on whether deferral would have been appropriate here.

Collectively, these witnesses confirmed that union stewards did not present the written grievance to the supervisor until after an oral discussion of the grievance took place and the supervisor was unable to provide a satisfactory resolution.

By contrast, beginning in the summer of 2011, a second supervisor began attending the Informal Step at the outset and supervisors would no longer engage in oral discussions unless stewards had described the grievance with particularity, "line by line and article by article." Tr. 220–24, 266, 403 (Nov. 16, 2011); *see* Tr. 107 (Nov. 15, 2011); Tr. 439, 447 (Nov. 17, 2011). Company supervisors also began refusing to sign for and certify Informal Step grievances for Step Two of the grievance process. Tr. 39–44 (Nov. 15, 2011); Tr. 355–56, 403–05, 410, 412 (Nov. 16, 2011); Tr. 910–11 (Jan. 18, 2012). In some instances, stewards were then required to file the same grievance for a second time, *see* Tr. 356 (Nov. 16, 2011), and in other instances, the company supervisor's refusal to sign and certify a written grievance for Step Two rendered the grievance untimely. Tr. 45–46 (Nov. 15, 2011); Tr. 274, 319, 403–05, 413 (Nov. 16, 2011).

Substantial evidence also supports the Board's finding that the company's changes to the CBA grievance process were "material, substantial, and significant" and thus violated Section 8(a)(5). *2014 PNM* 2–3. "[W]hat was once an informal discussion between the steward and the supervisor is now a more formal and protracted affair." *Id.* at 3 (quoting ALJ Dec. 15). Under Board precedent, a unilateral change to who attends a grievance meeting can itself be a significant enough change to violate Sections 8(a)(1) and (5). *See Barnard Coll.*, 340 NLRB 934, 944–45 (2003). So too an employer's refusal to process a grievance. *See, e.g.*, *Majestic Towers, Inc.,* 353 NLRB 304, 313 (2008). And the Board majority reasonably explained that it was appropriate to consider the cumulative effect of these three

changes even though the complaint listed each change as a separate violation. *2014 PNM* 3 n.10; *id.* (Member Johnson, dissenting in part). Not only did each change relate to the Informal Step, but they were all implemented at the same time and by the same document, prepared by a consulting firm ("Informal Grievance Guidelines for Supervisors"). The Board therefore properly considered them "in the context of the complaint as a whole." *In re Morrone*, 340 NLRB 1196, 1199 (2003).

## C.

The company's third challenge to the *2014 PNM* decision is a non-starter. Article 8 of the CBA incorporates all federal and state prohibitions against racial discrimination, and the parties' past practice makes clear that union business agents have represented unit members in disputes arising under the CBA. The company does not contest that it forced Cox to forgo union representation in his racial discrimination complaint after requiring, over the objection of Cox and the Union, bifurcation of his race and union animus complaints.

Although Article 10 of the CBA provides that "any employee may request the presence of a Union steward to represent the employee in the grievance," it also requires a grievant to present his grievance to his supervisor no later than 15 days after the alleged wrongdoing occurred. The company maintains that Cox did not follow these requirements, a failure which it views to strip Cox of his representation right. The Board maintains the court lacks jurisdiction to address this contention because the company never presented it to the Board, *see* 29 U.S.C. § 160(e), but we are satisfied that the Board had "adequate notice of the basis for the objection," *Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 143 (D.C. Cir. 1999). For instance, in its Reply Brief in Support of Exceptions at 5, the company invoked the grievance procedure in stating: "If Cox had initiated

the CBA's grievance process in connection with his complaints, then Cox would have been unquestionably entitled to Union participation in the process." Nonetheless, the company's challenge fails.

The Board finessed the question of whether the ALJ properly characterized Cox's racial discrimination complaint as a "grievance" under Article 10, ruling that such characterization did not "affect [the] disposition of this allegation." *2014 PNM* 1 n.6. Evidence showed that the company's past practices allowed Tafoya and other union business agents to represent unit members in any dispute "encompassed under" the CBA, *id.*, regardless of whether the underlying complaint could technically be characterized as an Article 10 "grievance." *Cf. Int'l Bhd. of Elec. Workers Local 1466*, 795 F.2d at 153. Ample undisputed evidence showed that it was customary to have union business agents, such as Tafoya, represent unit members in HR investigations that concern a provision of the CBA, such as Cox's racial discrimination complaint, even though such investigations are not governed by Article 10's procedures. Tr. 71–72 (Nov. 15, 2011). Similarly, union business agents would regularly represent unit members in "grievances" that were governed by Article 10. Tr. 31–32 (Nov. 15, 2011); Tr. 506 (Nov. 17, 2011). The Board therefore correctly concluded that the label attached to Cox's racial discrimination complaint did not deprive him of his right to representation by a Union agent.

Finally, the company's attempt to argue that its violations for unilaterally restricting union agents' access to its Edith Service Center and San Juan Generating Station are moot in light of its agreement to restore the agents' access to those facilities, Pet'r's Reply Br. 4–5, is doubly flawed: the argument is first raised in the company's reply brief without explanation, *see, e.g.*, *Al-Adahi v. Obama*, 613 F.3d 1102, 1111 n.6 (D.C. Cir. 2010), and an "employer's compliance with an order of the

Board does not render the cause moot," *NLRB v. Mexia Textile Mills*, 339 U.S. 563, 567 (1950).

Accordingly, because the Board is entitled to enforcement of the unchallenged violations, *see Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 418 (D.C. Cir. 1996), and of its Order remedying them, *Allied Mech. Servs., Inc. v. NLRB*, 668 F.3d 758, 765 (D.C. Cir. 2012), we deny the petition for review and grant the Board's cross-application for enforcement of its Decision and Order.