# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 2, 2018          Decided September 4, 2018

No. 17-1151

TEACHERS COLLEGE, COLUMBIA UNIVERSITY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

LOCAL 2110, TECHNICAL, OFFICE AND PROFESSIONAL UNION,
UNITED AUTO WORKERS AFL-CIO,
INTERVENOR

———

Consolidated with 17-1184

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Matthew J. Frankel* argued the cause for petitioner. With him on the briefs were *Kenneth J. Nichols* and *Tara E. Daub*.

*David Casserly*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Peter B. Robb*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General

Counsel, and *Ruth E. Burdick*, Deputy Assistant General Counsel.

Before: GARLAND, *Chief Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

Concurring opinion filed by *Senior Circuit Judge* SILBERMAN.

GARLAND, *Chief Judge*: Teachers College, an educational institution affiliated with Columbia University, petitions for review of a decision of the National Labor Relations Board. That decision affirmed an administrative law judge's conclusion that the College violated the National Labor Relations Act by refusing to provide information requested by a union representing the College's secretarial and clerical employees. The College contends that the union failed to demonstrate the relevance of the requested information. As we explain below, however, substantial evidence supports the Board's finding that the information was relevant and that the College was obligated to provide it. We therefore deny the petition for review and grant the Board's cross-application for enforcement.

I

Article I of the collective bargaining agreement (CBA) between the College and Local 2110, United Auto Workers, recognizes the union as "the exclusive bargaining agent for . . . all on campus full-time and part-time . . . secretarial and clerical employees." CBA art. I, ¶ 1 (J.A. 157). Since 2012, the union has suspected the College of violating the CBA by transferring work reserved to the bargaining unit to non-unit College employees. *See* Email from Jennifer Myers, Local 2110, to

Randy Glazer, Teachers College (June 13, 2012) (J.A. 397);
*Teachers College*, 365 N.L.R.B. No. 86, at 2 (May 31, 2017)
(ALJ Opinion) (J.A. 463). After communicating these
suspicions during contract negotiations in the spring of 2012, the
union filed a formal grievance with the College. *See* Email from
Myers to Glazer (Apr. 2, 2012) (J.A. 399); ALJ Opinion, 365
N.L.R.B. No. 86, at 2 (J.A. 463).

In its grievance, the union requested a list of "all non-unit
part-time, casual, hourly, temporary and internship" employees
and, for each employee, his or her "name, job title/classification,
department, rate of pay, work schedule, actual number of hours
worked per week," and starting and ending dates. *See* Email
from Myers to Glazer (Apr. 2, 2012) (J.A. 399). After a few
weeks of back-and-forth, the College advised the union that it
was "in the process of gathering items and w[ould] respond to
[the union's] requests when that process [wa]s completed."
Opinion & Award, *Local 2110, UAW v. Teachers College*, at 3
(Mar. 25, 2015) (March 2015 Arbitrator Opinion) (J.A. 188).
But the College later changed course, saying it believed the
union was requesting this information only "to support a charge
of unlawful conduct." Email from Glazer to Myers (Sept. 7,
2012) (J.A. 400). As such, the College asserted that it "ha[d] no
obligation to provide [the requested] information." *Id.*

The College acknowledged that, "if [the union] believe[s]
that particular work has been improperly transferred out of the
unit to a non-unit employee in violation of the CBA, this could
be subject to the grievance and arbitration procedure." *Id.* And
it further acknowledged that, "if a unit position is formally
assigned a significant responsibility . . . , that position should
normally maintain that responsibility unless there is good cause
for it to not be the case." Email from Glazer to Myers, at 2
(Dec. 4, 2012) (J.A. 403). Claiming that the CBA permitted the
shared work responsibilities about which the union complained,

however, the College denied the grievance in December 2012. *Id.*

The union took the matter to arbitration. In January 2015, the arbitrator concluded that the union's grievance was arbitrable under the CBA, and that he "ha[d] the authority to determine whether non-bargaining unit employees are performing unit work, and/or whether the College has transferred unit work to non-unit employees, and to fashion an appropriate remedy." Opinion & Award, *Local 2110, UAW v. Teachers College*, at 12 (Jan. 21, 2015) (January 2015 Arbitrator Opinion) (J.A. 185). The arbitrator ordered the parties to agree on what information the College would provide the union to facilitate further proceedings. March 2015 Arbitrator Opinion, at 5 (J.A. 189).

Following the arbitrator's order, the union's counsel sent the College's counsel a more targeted request for information regarding non-unit positions it suspected were performing unit work. *See* Letter from Alek Felstiner, Local 2110, to Tara Daub, Teachers College, at 1 (Apr. 13, 2015) (J.A. 194). The College again refused to provide any information, saying that it would not do so unless the union identified for each position "(i) the unit work allegedly transferred to such employees; (ii) the basis for the Union's belief that unit work has been transferred to such employees; and (iii) the alleged connection between the unit work and the information requested." Letter from Daub to Felstiner, at 4 (Apr. 17, 2015) (J.A. 201).

The union then made two further efforts to address those topics. First, in response to the College's request that the arbitrator dismiss the grievance, the union wrote a letter explaining at length why it believed the information requested was relevant to determining whether the College had impermissibly transferred work outside the unit. *See* Letter from

5

Felstiner to Richard Adelman, Arbitrator, at 3-5 (Sept. 10, 2015) (J.A. 337-39).

Second, after the arbitrator rejected the College's request to dismiss the grievance, *see* Opinion & Award, *Local 2110, UAW v. Teachers College*, at 5 (Sept. 28, 2015) (September 2015 Arbitrator Opinion) (J.A. 350), the union updated its request yet again and in more detail. As the administrative law judge (ALJ) summarized:

> [T]he Union had its members canvass the College, and review documentary and other evidence in their possession regarding what positions were performing unit work. Along with the Union's attorney, they compiled a list of nonunit positions that, in the Union's belief, performed unit work, going building by building, department by department, and floor by floor. The Union's attorney gathered the information they knew about each position, including the title, department, and history of the position, and created a chart of 34 nonunit positions. Along with a list of the position titles, the chart included the department for each position, and a short "comments" section setting forth the basis for the Union's belief and/or a description of the specific position in question.

ALJ Opinion, 365 N.L.R.B. No. 86, at 3 (citation omitted) (J.A. 464).

On October 22, 2015, the union emailed this chart to the College, asking the College to provide the information related to the listed positions. The email stated that the union had developed the chart by using job postings, information about assignment changes from unit employees, and unit employees' observations of the job functions non-unit employees were

performing. *See id.* The College once again accused the union of seeking the information for improper purposes and refused to budge unless the union further identified the unit work at issue. *See* Letter from Daub to Felstiner, at 4-5 (Oct. 28, 2015) (J.A. 366-67).

Three weeks later, the union filed an unfair labor practice charge with the National Labor Relations Board (NLRB). After a hearing, an ALJ concluded that the College violated section 8(a)(1) and (5) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1), (5), when it refused to provide the union with the information it had requested on October 22, 2015. ALJ Opinion, 365 N.L.R.B. No. 86, at 6 (J.A. 467).

The ALJ found that, by the time of its October 2015 request, the union "had established and demonstrated to the College both the relevance of the requested information and the existence of evidence that gave rise to the Union's reasonable belief in the relevance of that information." *Id.* at 4 (J.A. 465). The ALJ also concluded that the College had no valid defense because it failed to establish that the union's information request was made in bad faith as a discovery substitute for intended Board proceedings. *Id.* at 5 (J.A. 466). Finally, the judge held that the union's request was not overly broad or unduly burdensome because, inter alia, its request was "specifically targeted" to the positions identified, and the information was "the type of information that would either directly assist the Union in the arbitration or assist them in identifying further evidence to present to the arbitrator." *Id.*

On May 31, 2017, the NLRB affirmed the ALJ's decision. *See Teachers College*, 365 N.L.R.B. No. 86, at 1 (Board Decision) (J.A. 462). The College now petitions for review, and the Board cross-applies for enforcement of its order.

II

The College challenges the Board's determination that it violated section 8(a)(5) and (1) of the NLRA by refusing to produce the information the union requested.

Section 8(a)(5) imposes on an employer the "duty to bargain collectively." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303 (1979). That duty "has long been acknowledged to include a duty to supply a union with requested information that will enable [the union] to negotiate effectively and to perform properly its other duties as bargaining representative." *Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*, 711 F.2d 348, 358 (D.C. Cir. 1983) (internal quotation marks omitted). "Because a union's other duties include the duty to see to it that an employer meets its [collective bargaining agreement] obligations, the employer's duty to furnish information extends to data requested in order properly to administer and police a collective bargaining agreement." *N.Y. & Presbyterian Hosp. v. NLRB*, 649 F.3d 723, 729 (D.C. Cir. 2011) (citation and internal quotation marks omitted).

"[T]he duty imposed by section 8(a)(5) is subject to a minimum standard of relevance: 'The union's need and the employer's duty depend, in all cases, on the probability that the desired information [is] relevant, and that it [will] be of use to the union in carrying out its statutory duties and responsibilities.'" *Id.* at 729-30 (quoting *Oil, Chem. & Atomic Workers*, 711 F.2d at 359). The requisite showing of relevance depends on whether the union is requesting information about employees who are part of the bargaining unit or outside it. "For information about employees in the bargaining unit, it is presumed that the requested information is relevant . . . , and the employer must provide the information unless it can show the information is irrelevant." *U.S. Testing Co. v. NLRB*, 160 F.3d

14, 19 (D.C. Cir. 1998). With respect to employees outside the bargaining unit, "the burden is on the union to demonstrate the relevance of [the requested] information." *Id.*; *see N.Y. & Presbyterian Hosp.*, 649 F.3d at 730.

In this case, the union sought information regarding employees outside the bargaining unit in order to determine whether the employer was improperly transferring unit work to them. Accordingly, the burden was on the union to demonstrate the relevance of the information. Thus, a "bare assertion that it needs information" would be insufficient; the union needed to "explain to the employer why the information is relevant." 649 F.3d at 730. "Nevertheless," as we explained in *Presbyterian Hospital*, "the threshold for relevance is low. In particular, the union need not demonstrate the existence of some particular controversy or the need to dispose of some recognized problem. Rather, we apply a discovery-type standard, under which [t]he fact that the information is of probable or potential relevance is sufficient to give rise to an obligation" to provide it. *Id.* (citations and internal quotation marks omitted); *see NLRB v. Acme Indus. Co.*, 385 U.S. 432, 437 & n.6 (1967); *Brewers & Maltsters, Local Union No. 6 v. NLRB*, 414 F.3d 36, 45 (D.C. Cir. 2005); *Oil, Chem. & Atomic Workers*, 711 F.2d at 359.

The Board's factual findings are conclusive if supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). "Under this standard, 'the Board is to be reversed only when the record is so compelling that no reasonable factfinder could fail to find to the contrary.'" *Pub. Serv. Co. v. NLRB*, 843 F.3d 999, 1004 (D.C. Cir. 2016) (quoting *Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1072 (D.C. Cir. 2016)). And, "[b]ecause Congress has determined that the Board has the primary responsibility of marking out the scope . . . of the statutory duty to bargain, great deference is due to the Board's determinations of the scope of an employer's

obligation to provide requested information to a union," as that obligation "derive[s] from the statutory duty to bargain." *Id.* (internal quotation marks omitted).

A

The College's principal contention is that substantial evidence does not support the Board's finding that the union met its burden to demonstrate the relevance of the information it sought. We disagree.

1. As just noted, the courts and the Board apply a "discovery-type" standard, under which "[t]he fact that the information is of probable or potential relevance is sufficient to give rise to an obligation" to provide it. *N.Y. & Presbyterian Hosp.*, 649 F.3d at 730 (internal quotation marks omitted); *see, e.g.*, *Acme*, 385 U.S. at 437 & n.6. All that is required is "a reasonable belief, supported by objective evidence, that the requested information is relevant." *Disneyland Park*, 350 N.L.R.B. 1256, 1257-58 (2007). Under this standard, substantial evidence amply supports the ALJ's finding that, "by the time of its October 22, 2015 information request, the Union had established and demonstrated to the College both the relevance of the requested information and the existence of evidence that gave rise to the Union's reasonable belief in the relevance of that information." ALJ Opinion, 365 N.L.R.B. No. 86, at 4 (J.A. 465).

As the ALJ explained, in early 2015, "the arbitrator determined that he had the authority to determine whether nonbargaining unit employees were performing bargaining unit work, and/or whether the College transferred unit work to non-unit employees, and to fashion an appropriate remedy." *Id.* Thereafter, "[r]elying upon information received from union members [who] canvass[ed] the College in October 2015, along

with job postings and other documents in the Union's possession, the Union identified 34 nonunit positions it believed were performing bargaining unit work." *Id.* It then compiled this information into a chart that listed, for each such position, "to the best of its knowledge, the position name and department, and included a 'comment' section describing the specific position in question, or identifying the basis of the Union's belief that the position was performing unit work." *Id.*

On October 22, 2015, the union emailed the chart to the College. Email from Felstiner to Daub (Oct. 22, 2015) (J.A. 359) (attaching List of Positions Chart (J.A. 360-61)). The email stated the union's belief "that the College has improperly transferred bargaining unit work to employees in these positions." *Id.* The email further advised the College that, as recounted above, the "comments" column of the chart included "a brief note reflecting the basis for the Union's belief that the College improperly transferred unit work to the position(s) in question." *Id.* And it explained to the College how the union developed the information. *Id*.

The chart, and the work the union undertook to construct it, provide sufficient support for the ALJ's finding that the union had, and presented to the College, a reasonable belief that unit work was being performed outside the unit -- a concern that was directly relevant to its grievance. *See* ALJ Opinion, 365 N.L.R.B. No. 86, at 4 (J.A. 465). As we have noted, the CBA recognized the union as "the exclusive bargaining agent for . . . all on campus full-time and part-time . . . secretarial and clerical employees." CBA art. I, ¶ 1 (J.A. 157). It further defined "secretarial and clerical employees" as

> including clerks, account clerks, secretaries, receptionist-typists, clerk-typists, assistant supervisors in the Word Processing Center, correspondence clerks,

postal clerks, library assistants, personnel assistants, duplicating equipment operators, electronic data processing machine operators, bookkeeping machine operators, bookkeeping machine operator supervisors, key-punch operators, key-punch operator supervisors, audiovisual technicians, student financial aid counselors, cashiers, and telephone operators . . . .

*Id.* And the chart showed -- based on canvassing, job postings, and other documents -- numerous non-unit positions that appeared, at least on their face, to involve the bargaining unit work of "secretarial and clerical employees." Those included: five "secretary" positions and four positions previously filled by secretaries; three "front desk" positions and a fourth with "front desk" duties included in its job description, positions that were traditionally and reasonably associated with receptionist or secretarial work; two interim bookkeeping "clerk" positions; as well as other positions that reasonably appeared to be included within the definition of "secretarial and clerical employees" quoted above. *See* List of Positions Chart (J.A. 360-61).

The union's October 22 email asked the College to provide the following information for each of the 34 positions listed in the chart: (1) the title of the position; (2) the name or names of employee(s) filling the position; (3) the position type; (4) the department; (5) the regular schedule for the position; (6) the rate of pay; and (7) the current or past job descriptions. Email from Felstiner to Daub (Oct. 22, 2015) (J.A. 359). It is obvious to us, as it was to the ALJ, that this kind of information was relevant for processing the grievance and preparing for arbitration on the issue, both of which are central to the union's "carrying out its statutory duties and responsibilities," *Acme*, 385 U.S. at 437. *See* ALJ Opinion, 365 N.L.R.B. No. 86, at 4 (J.A. 465).

Indeed, in *Presbyterian Hospital*, we said as much regarding a union's request for information including non-unit "nurse practitioners' names . . . ; the departments or units where the nurse practitioners are assigned to work; their job duties and their start dates at the hospital." 649 F.3d at 727 (internal quotation marks omitted). "There can be little dispute," we said, that the information request "is relevant to the question whether non-bargaining unit [nurse practitioners] are performing bargaining unit work," and so "the [h]ospital was obligated to provide [the information]." *Id.* at 730. The same is true here.

2. We find unpersuasive the College's efforts to downplay the sufficiency of the union's showing.

The College argues that the union did not possess "objective evidence" of the relevance of its information requests "at the time of its request[s]." Reply Br. 1 (quoting *Pub. Serv. Co.*, 843 F.3d at 1005; *N.Y. & Presbyterian Hosp.*, 649 F.3d at 731). It charges that "Union counsel testified that he had no knowledge or belief, at the time he prepared and sent his October 2015 chart to Teachers College, as to what job duties the non-unit positions listed in the chart were performing or whether the union believed that any duties they performed were 'unit work.'" College Br. 27 (citing ALJ Hearing Tr. 62-65, 125-26 (J.A. 42-45, 86-87)). But this contention mischaracterizes the testimony: union counsel said only that he could not "speak to the Union's knowledge *as of November 20, 2014*," ALJ Hearing Tr. 65 (emphasis added) (J.A. 45) -- nearly a year before the October 2015 information request at issue here.

The parties agree that a union seeking information that is not presumptively relevant (as here) must "explain why the information is relevant" and must be able to support that explanation "with objective evidence." College Br. 26-27; NLRB Br. 18-19; *see N.Y. & Presbyterian Hosp.*, 649 F.3d at

730; *Disneyland Park*, 350 N.L.R.B. at 1258. The College further contends, however, that a union must not only explain relevance and possess objective evidence, but must also present that evidence to the employer at the time of its request. The NLRB disagrees.[1] Regardless of whether the College is correct on this front, the union has satisfied that requirement in this case. As of the date of the request, the union did have and did present the College with objective evidence: the member canvass and the postings to which it referred in its October 2015 email and chart. *See* ALJ Opinion, 365 N.L.R.B. No. 86, at 3 (J.A. 464). That evidence was sufficient.[2]

---

[1] *See Cannelton Indus.*, 339 N.L.R.B. 996, 997 (2003) ("A union cannot meet its burden based on a mere suspicion . . . ; it must have an objective, factual basis for [its belief] . . . . Under current Board law, however, the union is not obligated to disclose those facts to the employer at the time of the information request. Rather, it is sufficient that the General Counsel demonstrate at the hearing that the union had, at the relevant time, a reasonable belief."); *accord DirectSat USA, LLC*, 366 N.L.R.B. No. 40, at 4 (Mar. 20, 2018); *Piggly Wiggly Midwest, LLC*, 357 N.L.R.B. 2344, 2344 (2012).

[2] *See Walter N. Yoder & Sons, Inc. v. NLRB*, 754 F.2d 531, 536 (4th Cir. 1985) (crediting union president's testimony that another union official "reported to [him] that Yoder employees had told" the official about integrated operations with an alleged non-union alter-ego company); *Castle Hill Health Care Ctr.*, 355 N.L.R.B. 1156, 1156, 1181 (2010) (affirming ALJ's conclusion that an information request, generally citing "anecdotal information" from members, relied on "hearsay evidence . . . sufficient to support an information request"); *Magnet Coal, Inc.*, 307 N.L.R.B. 444, 444 n.3, 448 (1992) (crediting union president's testimony that he "had heard from employees . . . that the Company [and its alleged non-union alter-ego] had interchanged equipment"), *enforced*, 8 F.3d 71 (D.C. Cir. 1993).

The College also complains that the chart proffered by the union was too "conclusory." College Br. 44; *see id.* at 26-27. The chart, the College says, "provided only a list of 34 vaguely identified non-unit positions." *Id.* at 33. Again, we disagree. For each of the 34 positions, the union named the position and the department in which it was located. The chart's comments section added additional information, where available to the union, including the position's physical location, its history, and whether it was listed in the College's job postings.

The College says that many of the 34 positions listed in the chart used imprecise or inaccurate job titles. But to the extent the union's proffer reflected incomplete information about the identified work transfers, that lack of knowledge was precisely the reason for the information request and does not, as the College insists, prove that the union had "no good faith basis for the grievance," *Id.* at 8. *See Crowley Marine Servs., Inc. v. NLRB*, 234 F.3d 1295, 1296 (D.C. Cir. 2000) (upholding the Board's finding of a violation where "the information was sought and needed to enable the Union to make an informed judgment" about pursuing contract violation remedies (internal quotation marks omitted)); *Shoppers Food Warehouse*, 315 N.L.R.B. 258, 259 (1994) ("The Union was not required to show that the information which triggered its request was accurate or ultimately reliable, and a union's information request may be based on hearsay.").

Nor did the College, at any time, present any evidence contradicting the union's characterization of the referenced job postings. Instead, it disclaimed any duty to look into the union's allegations before refusing its request, unless the union met the College's demands for greater specificity. *See* Recording of Oral Arg. 28:03-29:20. Indeed, after repeated questioning at oral argument, it was unclear whether the College had even bothered to review the job postings mentioned in the October

2015 chart. As the Seventh Circuit said in *NLRB v. George Koch Sons, Inc.*: "It was reasonable for the Union to rely on the . . . observations of union officials, employee reports and records in forming its reasonable suspicion that the [employer] was diverting work to [a nonunion business the employer operated]. Therefore, considering that [the employer] did not present any evidence contradicting the contents of these reports and observations, [they] alone constitute substantial evidence . . . that the Union reasonably suspected that [the employer] was diverting work" in violation of the CBA. 950 F.2d 1324, 1333 (7th Cir. 1991) (citations omitted).

The College also argues that the chart's listings were insufficient because Article I of the CBA "defines the bargaining unit by titles, not by the type of work done by the employees." College Br. 30 n.5. This argument is somewhat confusing, given that the College's human resources director acknowledged that allegations "that particular work has been improperly transferred out of the unit . . . could be subject to the grievance and arbitration procedure." Email from Glazer to Myers (Sept. 7, 2012) (J.A. 400). It also disregards those chart listings that appear to describe positions by titles. The college further argues that, even if the unit is defined by job duties rather than titles, the cited duties are not exclusive to the unit under the CBA.

In any event, both of these arguments go to the merits of the union's grievance, upon which the Board does not pass in assessing the relevance of the requested information. *Bell Tel. Labs., Inc.*, 317 N.L.R.B. 802, 803 (1995), *enforced*, 107 F.3d 862 (3d Cir. 1997). As the Supreme Court has explained:

> [W]hen it order[s] the employer to furnish the requested information to the union, the Board [is] not making a binding construction of the labor contract. It

> [is] only acting upon the probability that the desired information [is] relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities. This discovery-type standard decide[s] nothing about the merits of the union's contractual claims.

*Acme*, 385 U.S. at 437. The union was "not required to accept" the College's view of the CBA; it "was entitled to conduct its own investigation and reach its own conclusions about the applicability of the agreement." *Shoppers Food Warehouse*, 315 N.L.R.B. at 259.

3. Finally, the College maintains that, "[i]n its prior decisions, the Board has made clear that this type of showing is insufficient to establish relevance." College Br. 34. The prior decisions it cites are inapposite.

The College cites *Disneyland Park*, in which the "Board held that the agent's 'testimony did not explain how the requested information would be relevant to support an arguable violation of the contract,' and thus could not 'serve to establish that the Union provided to the Respondent a sufficient factual basis to establish relevance at the time the information request was made.'" *Id.* at 36 (quoting *Disneyland Park*, 350 N.L.R.B. at 1259). According to the College, the "exact same analysis applies here." *Id.* But it does not. In *Disneyland Park*, the union requested information about non-unit employees to whom the CBA expressly permitted the employer to subcontract work. 350 N.L.R.B. at 1258-59. Here, by contrast, the union points to CBA language that is reasonably read as reserving to the unit the work it believes was transferred. Indeed, the arbitrator repeatedly stated that the union had presented an arbitrable grievance regarding the transfer of unit work. *See, e.g.*, January 2015 Arbitrator Opinion, at 12 (J.A. 185); September 2015

Arbitrator Opinion, at 4 (J.A. 349) (stating that "the Union may be able to prove some contract violation").

The College also cites *Postal Service*, 310 N.L.R.B. 701 (1993), for the proposition that "vague, general reports" are insufficient to show relevance. College Br. 35 (quoting *Postal Serv.*, 310 N.L.R.B. at 703). But in that case, the union's basis for requesting information about supervisors it thought might have engaged in conduct similar to that for which an employee was disciplined was "nothing more than that, at a union meeting, employees had furnished supervisors' names in response to an appeal for the names of those who had had 'prolonged absences.'" *Postal Serv.*, 310 N.L.R.B. at 703. Here, by contrast, far from presenting the College with "vague, general reports," the union explained that its allegations were founded on (1) a broad survey of unit members, who reported multiple instances of improper work transfers, and (2) the College's own job postings. Union counsel Alek Felstiner testified before the ALJ as follows:

> After the arbitrator's decision [declining to dismiss the grievance], I met with Union members twice; groups of Union members at Teachers College, and they essentially canvassed the college and also surveyed documentary evidence, information that they had, in order to compile this list . . . and identify sort of building by building, floor by floor, department by department which positions the Union believed were performing unit work even though the positions were not in the unit.

ALJ Hearing Tr. 50 (J.A. 33).

4. In sum, substantial evidence supports the NLRB's determination that the union had adequate and objective

evidence to support a reasonable belief that the requested information was relevant to its pending grievance. What really appears to underlie the College's argument is an implied claim that evidence satisfying more than a "discovery-type" standard is required. But that is a claim our precedent rejects.

B

The College challenges the Board's decision on two additional, but equally unpersuasive, grounds.

First, the College contends that the record compels the conclusion that the union requested the information in bad faith. Under Board precedent, a union may not use an information request, ostensibly made for purposes of policing a collective-bargaining agreement, as a discovery device to pursue proceedings before the NLRB. *Union Tribune Publ'g Co.*, 307 N.L.R.B. 25, 26 (1992) (holding that, because Board procedures do not include prehearing discovery, a party may not use an information request to "impose a discovery requirement where none otherwise exists"), *enforced*, 1 F.3d 486 (7th Cir. 1993); *WXON-TV, Inc.*, 289 N.L.R.B. 615, 617-18 (1988), *enforced*, 876 F.2d 105 (6th Cir. 1989). "An employer charged with failing to provide requested information may argue as an affirmative defense that the request was made in bad faith . . . ." *Monmouth Care Ctr. v. NLRB*, 672 F.3d 1085, 1094 (D.C. Cir. 2012). "But the employer bears the burden of persuasion on that defense," *id.*, and substantial evidence supports the NLRB's determination that the College failed to satisfy that burden.

Much of the College's argument on this point is a repetition of its claim that the union had no reasonable basis for believing that work had been transferred out of the unit, and hence no basis for requesting the information as relevant. The "Union's inability to show an objective basis for the relevance of its

requests," the College insists, "compels the conclusion that the Union's real objective is to prepare to use Board procedures for organizing or accreting non-unit positions into the bargaining unit." College Br. 42. But we have rejected the contention that the union was unable to show relevance, and thus that claimed inability can hardly form the basis for an affirmative defense of bad faith.

The College also claims that the union openly "admitted its intent was to either pursue [an unfair labor practice] charge against Teachers College for 'unlawful' conduct or to file a unit clarification petition to accrete non-unit positions into the Union's unit . . . , despite their express exclusion from the scope of the CBA's recognition clause." *Id.* at 40. That assertion rests on correspondence from three years before the October 2015 request, in which the union filed a *grievance* stating that the College had improperly excluded positions from the unit. *See* Email from Myers to Glazer (Apr. 2, 2012) (J.A. 399). In the same correspondence chain, the union stated that the grievance included the improper work transfers. *See* Email from Myers to Glazer (June 13, 2012) (J.A. 397). Indeed, it pursued that work-transfer grievance to arbitration. And, as the ALJ pointed out, "at the time of the information request, there were no outstanding charges or complaints pending before the Board." ALJ Opinion, 365 N.L.R.B. No. 86, at 5 (J.A. 466). To the contrary, the only ongoing proceeding when the union made its October 22, 2015 request was the arbitration. In that context, the three-year-old correspondence does not satisfy the College's burden to show the union's bad faith.

Second, the College argues that, "even if, arguendo, the Union demonstrated relevance with respect to certain positions," the union failed to establish the relevance of each type of information it requested for each individual position in its October 2015 chart. College Br. 43. As to this argument, our

analysis can be brief. In its exceptions below, the College did not challenge or dispute the request as it applied to any specific position. *See* College Br. in Supp. of Exceptions 20-21 (J.A. 446-47). We therefore may not consider such challenges now. *See* 29 U.S.C. § 160(e); *Monmouth*, 672 F.3d at 1094.

## III

For the foregoing reasons, we deny the petition for review and grant the Board's cross-application for enforcement.

*So ordered*.

SILBERMAN, *Senior Circuit Judge*, concurring: I am in full agreement with the court's reasoning. I write separately to contest the reasonableness of the Board's view expressed in *Piggly Wiggly Midwest, LLC*, 357 N.L.R.B. 2344, 2344 (2012), which we note in footnote 1 but upon which we do not rely. The Board there said that although a union seeking information concerning non-bargaining unit activities must have a factual basis to support the relevance to the bargaining unit of that information, it need not disclose those facts to the employer; it is sufficient that the General Counsel present those facts to the ALJ at an unfair labor practice hearing.

I think that is a paradigmatic example of arbitrary and capricious decision-making. An employer under Board law must accommodate a union's request for non-bargaining unit information if it is relevant to bargaining unit concerns, but can legitimately refuse if the union has no factual basis for asserting that relevance. That decision must be made at the time of the union's request, and if the employer is wrong, it violates the law. It seems to me to be absurd for the Board to hold that an employer who is not faced with alleged facts supporting a union's claim of relevance at the time of the request – and therefore apparently acting within the law – can be retroactively determined to have violated the Act by virtue of factual evidence first put on by the General Counsel at a hearing before an ALJ. This seems to even raise an issue of due process.