Opinion for the Court filed by Circuit Judge TATEL.
Dissenting opinion filed by Circuit Judge HENDERSON.
TATEL, Circuit Judge:
Once again, we confront the issue of how much information a company must provide to a union during collective bargaining. Here, the company sought substantial wage concessions on the basis of competitive pressures it claimed to be facing. Seeking to verify this contention, the union requested information about the company’s prices and customers. The company denied the union’s request and then locked out the bargaining unit employees. Relying on a line of decisions endorsing a broad discovery standard, the National Labor Relations Board found that the union’s information request was relevant to its duties as the employees’ bargaining representative and that the company’s information withholding and lockout were both unlawful. For the reasons given below, we deny the company’s petition for review and grant the Board’s cross-application for enforcement.
I.
Petitioner KLB Industries manufactures aluminum extrusions at its Bellefontaine, Ohio, facility. Since taking over the plant *553 in 1997, KLB has signed three collective bargaining agreements with its sixteen-member union. On September 20, 2007, ten days before the third agreement expired, the parties began negotiating a fourth agreement.
From the outset, KLB and the union took dramatically different positions. The company’s position “centered around competitiveness.” KLB Industries, 357 NLRB No. 8, 4 n. 9 (July 26, 2011). Specifically, it claimed that it was facing increased competition from Asian manufacturers, rising production costs, and decreased productivity. KLB also expressed concern about retaining customers. Based on these claims, the company initially demanded substantial wage concessions: a twenty percent reduction in the first year and no changes the following two years. By contrast, the union sought wage increases. Throughout late September, the negotiations focused on wages and health insurance, and the parties agreed to a day-to-day extension of the expiring collective bargaining agreement.
On October 3, KLB notified the union that it would terminate the collective bargaining agreement on October 7. That same day the company made its last and final offer, which included an eight percent wage reduction the first year and two percent reductions in the second and third years. The union countered with moderate wage increases. Even though the federal mediator remarked that an impasse had been reached, the parties continued negotiating.
The next day, on October 4, the union sent KLB a letter requesting the following information: (1) a list of all current customers; (2) a copy of all price quotes that the company had provided over the past five years and an indication of which of those quotes had been awarded; (3) a list of all projects outsourced over the past five years that had been handled by bargaining unit employees; (4) a list of all customers who had ceased purchasing from KLB during the last five years; (5) a complete list of prices for KLB’s products; (6) market studies concerning the company’s products; and (7) a complete calculation of KLB’s projected savings from its concessionary wage proposal, including an estimate of overtime. The union explained that it needed this information because, “[djuring the course of the[ ] negotiations, [KLB] has continually asserted that they must improve the competitive position of the Bellefontaine, Ohio facility.” According to the letter, the union needed the requested information generally to verify KLB’s competitiveness claim and the price information specifically to “compare the prices of competitors.” Similarly, the union requested the list of lost customers to “test the Company’s assertion that they are not competitive.” Throughout early and mid-October, the parties continued negotiating and the wage issue remained a major sticking point.
On October 18, KLB responded to the information request, refusing to hand over information because its “desire to remain competitive in both global and domestic markets is no different from the desire of any business conducting operations similar to [this company].” KLB nonetheless disclosed estimated annual wage savings— one of the types of information the union had sought — without providing its underlying calculations or a prediction of overtime hours. The next day, KLB informed the union that a lockout would begin on October 22. KLB also informed the employees that their health insurance benefits would expire and that they would need to apply for COBRA benefits to continue receiving health insurance. Shortly thereafter, on October 21, the union responded to KLB’s *554 information disclosure, stating that it was insufficient to address the company’s proposed wage cuts.
As announced, KLB locked out unit employees on October 22 and subsequently hired replacement workers. Two incidents relevant to this case occurred during the lockout. First, after KLB terminated the bargaining unit’s health insurance, it discovered that the cancellation of the entire plan meant that unit employees were ineligible for COBRA benefits. Second, several months into the lockout, the company called the police to report that union employees had trespassed on company property when they placed picket signs on a public right of way.
The union filed unfair labor charges against KLB and at a hearing before an administrative law judge, the company continued to press its competitive disadvantage argument. In his opening statement, the company’s attorney explained that “KLB was faced, in the 2007 negotiations, with business conditions it had not faced in previous years. KLB faced increased competition from Asia.” The attorney also stated that the company “had suffered a customer setback that ended up costing it approximately a million dollars.” To support these claims, KLB introduced into evidence a “Top 20 Customer Sales” chart detailing the past three years of sales. The ALJ found that the reasons offered by KLB at the hearing mirrored those offered at the negotiating table.
The ALJ concluded that because KLB had invoked competitive pressures as its key rationale in seeking wage concessions, the union was entitled to the requested information to verify those assertions. Rejecting the company’s alternative arguments that its wage information disclosure was sufficient and that the union had requested information in bad faith, the ALJ concluded that the company’s information withholding violated sections 8(a)(1) and (5) of the National Labor Relations Act. 29 U.S.C. § 158(a)(1) & (5). The ALJ also found that the lockout and cancellation of health insurance violated sections 8(a)(1), (3), and (5). The ALJ, however, dismissed the union’s allegation that the company had engaged in so-called surface bargaining — that it had bargained in bad faith. Finally, the ALJ found that the company had committed an unfair labor practice by calling the police in retaliation for the union’s legal picketing. The Board, with one member dissenting, adopted the ALJ’s factual findings, legal reasoning, and proposed order. The dissenting member disagreed with the Board’s disclosure ruling and its conclusion that the lockout was unlawful, but agreed that KLB’s cancellation of employees’ health insurance violated section 8(a)(5).
KLB now petitions for review, challenging the Board’s rulings on the disclosure issue, the lockout, and the health insurance cancellation. The Board moves for enforcement of its finding that KLB’s call to the police violated the Act. “We must uphold the Board’s decisions unless upon reviewing the record as a whole, we conclude that the Board’s findings are not supported by substantial evidence or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case.” Pacific Micronesia Corp. v. NLRB, 219 F.3d 661, 665 (D.C.Cir.2000) (internal quotation marks omitted). We accord “due deference to the reasonable inferences that the Board draws from the evidence, regardless of whether the court might have reached a different conclusion de novo.” U.S. Testing Co. v. NLRB, 160 F.3d 14, 19 (D.C.Cir.1998) (internal citation omitted).
II.
The core dispute in this case is whether the company’s competitive disadvantage *555 claim triggered an obligation to respond to the union’s targeted request for information about customers and products. Our starting point is the Supreme Court’s decision in NLRB v. Truitt Manufacturing Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), where an employer claimed that it could not afford to pay higher wages but refused the union’s request to supply information to verify that claim. The Court held that a “refusal to attempt to substantiate a claim of inability to pay. increased wages may support a finding of a failure to bargain in good faith.” Id. at 153, 76 S.Ct. 753. If an “argument is important enough to present in the give and take of bargaining,” the Court reasoned, “it is important enough to require some sort of proof of its accuracy.” Id. at 152-53, 76 S.Ct. 753. In so ruling, however, the Court carefully acknowledged the limits of its decision:
We do not hold ... that in every case in which economic inability is raised as an argument against increased wages it automatically follows that the employees are entitled to substantiating evidence. Each case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met.
Id. at 153-54, 76 S.Ct. 753 (footnote omitted). Truitt thus stands for the proposition that failure to disclose relevant information can amount to an unfair labor practice under certain circumstances.
Following Truitt, the Board developed two lines of cases that apply the Court’s fact-intensive standard. The parties disagree about which line of precedents controls this case.
The first requires an employer to “open its books” to the union if it “pleads poverty” or raises an “inability to pay” defense during collective bargaining negotiations. Until 1991, the Board treated “a plea of competitive disadvantage [as] the functional equivalent of a statement of inability to pay.” United Steelworkers of America v. NLRB, 983 F.2d 240, 244 (D.C.Cir. 1993). But prompted by a series of Seventh Circuit decisions, the Board changed course. See, e.g., NLRB v. Harvstone Manufacturing Corp., 785 F.2d 570 (7th Cir.1986). In Nielsen Lithographing Co., 305 NLRB 697 (1991), the Board expressly rejected its prior approach of treating competitive disadvantage claims as automatically triggering a broad disclosure obligation. Under Nielsen, “an employer’s obligation to open its books does not arise unless the employer has predicated its bargaining stance on assertions about its inability to pay during the term of the bargaining agreement under negotiation.” Id. at 700. In other words, a company’s obligation to open its books is triggered when it claims an inability to pay, not when it is unwilling to pay. Furthermore, an employer’s disclosure obligation under Nielsen is quite broad: a union is entitled to records sufficient to conduct a full financial audit. Employers that plead poverty must turn over “detailed financial information” such as “financial statements and tax returns for the past three years, the projected balance sheets and income statements ... submitted to banks to obtain loans, and information concerning the salaries and perquisites of the company’s managerial employees.” Graphic Communications International Union v. NLRB, 977 F.2d 1168, 1169 (7th Cir.1992).
We addressed the Board’s Nielsen standard in ConAgra, Inc. v. NLRB, 117 F.3d 1435 (D.C.Cir.1997). There, the employer conceded that it could afford to continue paying above-market wages, but insisted that competitive pressures required a wage reduction. Although the employer *556 turned over information concerning its wages and pension plan, it refused to provide “financial statements, an additional two years’ worth of information on sales to competitors, or any information regarding [the parent company’s subsidiaries].” Id. at 1438. Ruling that the employer’s competitiveness claim constituted a “plea of poverty,” the Board found that the company’s refusal to furnish the requested information amounted to an unfair labor practice. We disagreed, stating that the Board’s decision “represented an unacknowledged and unexplained departure” from Nielsen. Id. at 1436. Given the Board’s previous change of position in Nielsen, we signaled that we would henceforth carefully scrutinize a finding that a company had pled poverty.
Running parallel to the Nielsen line of cases, a series of “discovery” decisions also applies Truitt’s holding that information withholding can constitute an unfair labor practice. These cases start with the premise that collective bargaining “includes a duty to provide relevant information needed by a labor union for the proper performance of its duties as the employees’ bargaining representative.” Detroit Edison Co. v. NLRB, 440 U.S. 301, 303, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979). This Court, moreover, has “long adhered to the view that the Board is to apply a liberal discovery-type standard, under which the requested information need only be relevant to the union in its negotiations.” U.S. Testing Co., 160 F.3d at 19. “Relevance is broadly construed, and in the absence of a countervailing interest, any requested information that has a bearing on the bargaining process must be disclosed.” Id. Relevance is presumed if the information concerns the bargaining unit. But “the burden is on the union to demonstrate the relevance of information about nonunion employees.” Id.
Significantly for the issue before us, the Board has applied its discovery line of cases to an employer’s competitive disadvantage claim. For example, in Caldwell Manufacturing Co., 346 NLRB 1159 (2006), the Board found that a company committed an unfair labor practice when it refused to turn over requested information concerning “material costs, labor costs, manufacturing overhead, productivity calculations, competitor data, and data on possible new production.” Id. at 1159 n. 3. The Board observed that the union’s “requests were made directly in response to specific factual assertions made by the [company] in the course of bargaining.” Id. at 1160. Given this, the union was entitled to “request[] information to evaluate and verify the [company’s] assertions and develop its own bargaining positions.” Id. Distinguishing Nielsen and its progeny, the Board emphasized that the union did not seek “general access to the [company’s] financial records,” such as “the [company’s] profits, net income, tax returns, salary information, or administrative expenses.” Id. Rather, the union’s information request in Caldwell Manufacturing was appropriate because it was tailored to the company’s factual assertions. See also A-1 Door and Building Solutions, 356 NLRB No. 76, 2011 WL 96412, at *4-5 (Jan. 11, 2011).
We distill these two lines of cases as follows. On the one hand, Nielsen stands for the proposition that a company pleading poverty must open its books for a full financial audit — a disclosure obligation that extends to a plethora of financial information. But as Nielsen also makes clear, a competitive disadvantage claim is insufficient, by itself, to obligate a company to open its books. On the other hand, the Board’s discovery line of cases endorses a relevancy-based, pro-disclosure standard that allows a union to request specific *557 information to verify a company’s stated position, including competitiveness claims.
With these principles in mind, we turn to the Board’s decision in this case. The Board found that KLB “repeatedly sought to justify its demands by stating that concessions were necessary to make its facility more competitive.” KLB Industries, 357 NLRB No. 8, at *1. Undertaking a thorough explanation of the relevant precedents concerning when an employer is required to disclose information to a union and analogizing this case to Caldwell Manufacturing, the Board evaluated the dispute under its discovery line of cases. The Board explained that by relying on competitive pressures as a justification for wage concessions, the company had made the veracity of that claim relevant to the negotiations. Accordingly, the union was entitled to the requested information to verify the company’s assertions. As the Board pointed out, the Top 20 Customer Sales chart could have proven useful to the union in its effort to evaluate the competitive pressures facing KLB. Addressing the Nielsen line of cases, the Board concluded that “[t]his is not an inability-to-pay case,” id. at 3, meaning that KLB had no obligation to open its books for a full financial audit. Responding to the dissenting member’s argument that Nielsen controls, the Board explained that nothing in Nielsen implies that “a union faced with something less than an inability-to-pay claim is not entitled to any information.” Id. Thus, harmonizing the two lines of cases, the Board concluded that “an information request ... is not an all-or-nothing proposition.” Id.
Challenging the Board’s reasoning, KLB’s central claim is that a “generalized competitiveness claim is insufficient to make the information at issue ... relevant.” Pet’r’s Br. 14. According to KLB and our dissenting colleague, dissenting op. at 565-67, competitive disadvantage claims have a talismanic quality that requires the application of Nielsen’s framework. Given the Board’s concession that this is not an inability-to-pay case, the company’s argument goes, it has no disclosure obligation.
KLB’s position ignores the Board’s careful approach to its own precedent. Unlike in ConAgra, the Board distinguished Nielsen and justified its decision under the discovery line of cases. As found by the ALJ and affirmed by the Board, record evidence establishes that KLB relied primarily on a competitiveness rationale in seeking substantial wage concessions. The union targeted its information request to that competitiveness claim and did not ask the company to open its books and provide generalized financial data concerning profits and management expenses. Thus, the union’s information request and the company’s concomitant disclosure obligation were narrow.
Nor does KLB offer a persuasive explanation for why a competitive disadvantage claim should be immunized from the Board’s “liberal discovery-type standard, under which the requested information need only be relevant to the union in its negotiations.” U.S. Testing Co., 160 F.3d at 19. It is true, as KLB emphasizes, that in a globalized economy the specter of competition haunts every company. But where, as here, an employer raises a competitiveness claim as its central justification for wage concessions, a union is entitled to information verifying that claim. Indeed, “a claim of pending competitive ruin generally requires some external verification before a union can reasonably rely upon it in deciding how to structure its negotiating strategy.” ConAgra, 117 F.3d at 1449 (Wald, J., concurring). We therefore agree with the Board that Caldwell *558 Manufacturing provides the appropriate framework for this case.
KLB alternatively argues that its competitiveness claim lacked the requisite specificity to trigger a disclosure obligation. The company points to language in Caldwell Manufacturing indicating that the employer there took the position during negotiations that its other facilities were more competitive. But KLB’s competitiveness claim was also specific. The Board found that the company had made “grave, specific, and recurring assertions of [its] lack of competitiveness.” KLB Industries, 357 NLRB No. 8, at *4. The Board highlighted KLB’s reliance on Asian competitors, rising production costs, and declining productivity. Although the company asserts, and the dissent agrees, dissenting op. at 564-66, that it made these claims at the administrative hearing rather than at the bargaining table, its representative testified that these concerns were relayed to the union during negotiations. Indeed, the testimony the dissent cites supports the Board’s conclusion. KLB’s negotiator testified that the company informed the union during negotiations that it needed to “stay competitive” because it was “competing with the Asian firms” and because “costs per hour, per production hour had risen, and ... production, itself, had actually dropped a little.” Thus, substantial record evidence supports the ALJ’s finding that the issues raised at the administrative hearing were the same issues discussed at the bargaining table. See KLB Industries, 357 NLRB No. 8, at *4 n. 9 (Board rejecting an identical argument and explaining that “the record makes clear that the [company] communicated these concerns not only at the hearing, but during negotiations as well”); id. at 50 (ALJ commenting that the company “defined or explained [its competitiveness claim] in a variety of ways” and finding that the reasons offered at the hearing mirrored those given at the bargaining table). See also Pacific Micronesia Corp., 219 F.3d at 665 (explaining that the Board must “present on the record such relevant evidence as a reasonable mind might accept as adequate to support [its] conclusion” (internal quotation marks omitted)).
Moreover, and contrary to the dissent, dissenting op. at 563, the Board reasonably concluded that the company’s competitive disadvantage claims could have been substantiated by examining price quotes, lost customers, and marketing strategies. As noted by the Board and invoked by union counsel at oral argument, the Top 20 Customer Sales chart could have demonstrated that KLB acquired a new customer worth $1 million in revenue in 2006 only to lose that customer in 2007. Similarly, a list of prices could have helped the union with accomplishing its stated goal of “comparing] the prices of competitors.” Not only was this information relevant to whether KLB faced an increasingly competitive business atmosphere, but the union’s contemporaneously proffered reason for needing the information — double-checking the company’s competitiveness claim — satisfies the “minimum standard of relevance” established by our precedent. New York and Presbyterian Hospital v. NLRB, 649 F.3d 723, 729 (D.C.Cir.2011).
Of course, the specific information necessary to verify a competitiveness claim will vary depending on the circumstances of the case. By adopting a contextualized approach, Caldwell Manufacturing and its progeny are faithful to Truitt’s mandate that “[e]ach case must turn upon its particular facts.” Truitt, 351 U.S. at 153, 76 S.Ct. 753. To the extent KLB now contends the dividing line between Nielsen’s “open your books” disclosure obligation and the instant information request is arbitrary and capricious, that argument is *559 waived because it first appeared in the company’s reply brief. See Lake Carriers’ Association v. EPA 652 F.3d 1, 10 n. 9 (D.C.Cir.2011) (noting that “arguments not raised until the reply brief are waived”).
To be clear, we are sensitive to the risk that the Caldwell Manufacturing line of eases could become an end-run around Nielsen. But this case does not implicate that concern. Before this Court, KLB has pursued an all-or-nothing litigation strategy to disclosure. Relying on Nielsen, it argues that it had no disclosure obligation because it never pleaded poverty, and relying on Caldtuell Manufacturing, it argues that its competitiveness claim was insufficiently specific to trigger a disclosure obligation. As explained above, neither argument has merit. And critically for our purposes, the company does not argue here that even if it had a disclosure obligation, the union’s information request was irrelevant. Given this, we have no need to demarcate the outer limits of the Board’s discovery line of cases.
KLB makes two subsidiary arguments. First, it claims that it provided an adequate cost savings report for its wage concessionary plan. Recall that the union requested that KLB provide an estimate— with underlying calculations and overtime hours — of how much money its wage concessionary plan would save. Although the company provided annualized savings estimates, it failed to include the underlying calculations and the predicted overtime. Because a union is “entitled to inspect the data relied on by an employer and does not have to accept the employer’s bald assertions or generalized figures at face value,” E.I. Du Pont de Nemours & Co. v. NLRB, 489 F.3d 1310, 1316 (D.C.Cir.2007), KLB’s argument is meritless.
Second, the company argues that the union made its information request in bad faith. According to KLB, the timing of the union’s request — the day after the federal mediator’s offhand remark about an impasse — reveals its pretextual nature. KLB further complains that the union made no mention of the information request until after the announcement of the lockout. But the federal mediator — not the company’s representative — made the impasse remark, and the parties continued negotiating after that remark and after the union’s information request. Moreover, the company only responded to the information request the day before the lockout announcement, which explains why the union remained silent for so long. Given this chronology and the importance of the wage issue to the negotiations, the Board properly found that KLB failed to rebut the presumption of good faith bargaining. See DaimlerChrysler Corp. v. NLRB, 288 F.3d 434, 443 (D.C.Cir.2002) (“The Board presumes that requests for presumptively relevant information are made in good faith, until the company demonstrates otherwise.”).
III.
Having resolved the information withholding issue, we can quickly dispose of KLB’s remaining arguments.
The company makes several interrelated contentions concerning the lawfulness of the lockout. We reject its first claim— that the information withholding was lawful and therefore the lockout was lawful— for the reasons stated above. KLB next asserts that the lockout was lawful because the Board dismissed the surface bargaining allegation. The company misinterprets the Board’s reasoning. The information withholding made the lockout unlawful notwithstanding KLB’s otherwise good faith bargaining. Thus, the Board’s dismissal of the surface bargaining allegation is irrelevant. KLB claims that the Board failed to expressly find that the in *560 formation withholding — and not another issue, like the health insurance dispute— materially affected the progress of the negotiations. The Board, however, adequately explained the nexus between the wage dispute and the information request:
[The] proposed concessions were the central point of disagreement during negotiations____ The Union’s information request was designed to enable the Union to evaluate and respond to that proposal. Absent the Union’s willingness to buy “a pig in a poke,” that information was therefore critical to the bargaining and the possibility of the parties’ reaching an agreement....
KLB Industries, 357 NLRB No. 8, at *6. Thus, contrary to the dissent, dissenting op. at 567-68, the Board did address whether the unlawful information withholding had a material effect on the progress of the negotiations.
Finally, given our conclusion that the lockout was unlawful, we have no need to discuss KLB’s contention regarding the health insurance cancellation.
IV.
The Board seeks enforcement of its finding that KLB unlawfully responded to the union’s picketing by calling the police. Because the company failed to file exceptions to this finding, it is jurisdictionally barred from obtaining review in this Court. See 29 U.S.C. § 160(e) (“No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.”).
We deny KLB’s petition for review and grant the Board’s cross-application for enforcement of its Order.

So ordered.