# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 19-1263**

**September Term, 2020**

FILED ON: NOVEMBER 13, 2020

WYMAN GORDON PENNSYLVANIA, LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL
AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,
INTERVENOR

Consolidated with 20-1020

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

Before: HENDERSON, MILLETT, and PILLARD, *Circuit Judges*.

## J U D G M E N T

This petition for review and this cross-petition for summary enforcement were considered on the record from the National Labor Relations Board and on the briefs and oral argument of the parties. We have accorded the issues full consideration and determined that they do not warrant a published opinion. *See* D.C. CIR. R. 36(d). It is

**ORDERED AND ADJUDGED** that the petition for review be dismissed in part and denied in part, and that the cross-petition for summary enforcement be granted.

**I**

Wyman Gordon Pennsylvania, LLC challenges the National Labor Relations Board's decision finding multiple unfair labor practices arising out of the company's (i) failure to negotiate

prior to delaying an annual wage increase, (ii) refusal to provide information to the union that was pertinent to the bargaining unit and bargaining subjects, and (iii) improper withdrawal of recognition from the union. The Board's resolution of each of those issues was consistent with the law and supported by substantial evidence. Settled precedent forecloses Wyman Gordon's separate challenge to the remedial imposition of an affirmative-bargaining order.

## A

Section 7 of the National Labor Relations Act protects the rights of employees "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" 29 U.S.C. § 157. To enforce those rights, Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7.]" *Id.* § 158(a)(1). Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of [the] employees[.]" *Id.* § 158(a)(5). A violation of Section 8(a)(5) is also a derivative violation of Section 8(a)(1). *Enterprise Leasing Co. of Fla. v. NLRB*, 831 F.3d 534, 546 (D.C. Cir. 2016).

## B

Wyman Gordon Pennsylvania, LLC manufactures components for aircraft engines. On April 14, 2015, the National Labor Relations Board certified the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers Union, AFL–CIO–CLC ("Union") as the exclusive collective bargaining representative of all full-time and regular part-time production and maintenance employees at Wyman Gordon's facility in Plains, Pennsylvania. Disputes and breakdowns in the collective bargaining process between Wyman Gordon and the Union soon arose, five of which are relevant here.

First, Wyman Gordon had a longstanding practice of giving employees in the bargaining unit an annual wage increase every August 1st. But in August 2016, while Wyman Gordon and the Union were negotiating their first collective bargaining agreement, the company postponed its traditional August 1st wage increase. Wyman Gordon did not give the Union any advance notice of the postponement, nor did Wyman Gordon negotiate the wage increase or the decision to table it. Instead, Wyman Gordon simply informed the Union on August 12, 2016, that it still intended to provide a wage increase retroactive to August 1, 2016, but it had not yet determined when to do so or what the amount would be. In January 2017—and only after withdrawing recognition from the Union—Wyman Gordon finally provided the employees a retroactive wage increase of fifteen cents per hour.

Second, during the fourteen months of negotiations over a collective bargaining agreement, the Union requested information from Wyman Gordon that the Union believed pertained to matters subject to the bargaining process. Specifically, on August 12, 2016, the Union requested the date and amount of any quarterly bonuses that bargaining-unit employees had received over the past three years, as well as any written policies about the bonuses and information about how those

bonuses were calculated. Separately, on August 31, 2016, while bargaining over employee benefits, the Union requested health insurance plan documents and written communications announcing or describing changes to health insurance plans between January 1, 2013, and December 31, 2014. Six days later, the Union requested "[t]he current prices for the five items produced by the facility that realize the greatest revenue[,]" "[a]ll changes to the prices of the items [that realize the greatest revenue] between January 1, 2014, and [September 6, 2016,]" and "[t]he labor cost at the facility as a percentage of the price of each of the items [that realize the greatest revenue] as of January 1 of 2016, 2015, and 2014." J.A. 1418. The latter request was in response to a claim by Robert Grimaldi, the company's lead negotiator, that Wyman Gordon would not increase wages for 2016 because it did not want its customers to be faced with a 15% increase in prices.

Third, prior to the Union's election, Wyman Gordon had an established practice of providing light-duty work for employees who had suffered work-related injuries and were on workers' compensation. After the Union arrived, Wyman Gordon abruptly ceased providing such light-duty work for five of the unit employees.

Fourth, Wyman Gordon's employee handbook included a confidentiality requirement that forbade Wyman Gordon's employees from exchanging addresses or telephone numbers.

Finally, on November 23, 2016, a lawyer from the National Right to Work Legal Defense Foundation presented Wyman Gordon with what was described to be a petition to decertify the Union signed by 23 of the 43 employees in the bargaining unit. The document consisted of five unnumbered pages. J.A. 587–591. The first and last pages contained signature lines with (collectively) nine signatures, as well as a statement that the "undersigned employees of Wyman Gordon[] do not want to be represented by [the Union.]" J.A. 587, 591. The middle three pages of the petition, though, contained only signature lines, lacking that same decertification language or any other explanation of what the document being signed was. J.A. 588–590. Fourteen signatures were on those middle three pages. Six days later, in reliance on that petition, Wyman Gordon unilaterally withdrew recognition from the Union.

## C

After a five-day hearing, an administrative law judge ("ALJ") found that Wyman Gordon had committed several unfair labor practices. As relevant here, the ALJ found that Wyman Gordon had violated Section 8(a)(1) of the Act by maintaining an unlawful confidentiality statement. The ALJ also ruled that Wyman Gordon had violated Sections 8(a)(5) and (1) of the Act by (i) failing to negotiate the annual wage increase for 2016 in advance of its suspension on August 1st, (ii) failing to provide the Union with relevant requested information, (iii) unlawfully discontinuing light-duty work for employees receiving workers' compensation without notifying or bargaining with the Union, and (iv) unlawfully withdrawing recognition from the Union. Among other remedies, the ALJ issued an affirmative-bargaining order that obligated Wyman Gordon to negotiate with the Union for at least six months.

The National Labor Relations Board largely affirmed. The Board first determined that no

party had excepted to the finding that Wyman Gordon had unlawfully failed to negotiate the annual wage increase prior to the unilateral suspension on August 1st. The Board also decided that Wyman Gordon had not properly contested the finding that it had failed to provide the Union with requested health care information, describing Wyman Gordon's exceptions as "bare" and "unsupported." *Wyman Gordon Pa., LLC*, 368 N.L.R.B. No. 150 at 1 n.1 (2019). The Board otherwise affirmed the ALJ's rulings at issue here. The Board then amended the remedial order to require Wyman Gordon to affirmatively bargain with the Union for an unspecified period of time.

Wyman Gordon petitioned for review, and the Board cross-applied for enforcement.

**II**

**A**

We have jurisdiction to review properly preserved challenges to the Board's decision under 29 U.S.C. § 160(e) and (f). We will uphold the Board's decision if it is not arbitrary, capricious, or grounded in legal error, and if substantial evidence supports the Board's factual findings. *Advanced Life Systems Inc. v. NLRB*, 898 F.3d 38, 43 (D.C. Cir. 2018); *see* 29 U.S.C. § 160(e). This court will not disturb a remedy imposed by the Board unless it is a "patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943).

**B**

Wyman Gordon did not raise before the Board any challenge to the ALJ's findings and conclusions regarding (i) the company's failure to bargain before terminating light-duty work for those employees on workers' compensation, and (ii) the unlawfulness of its employee confidentiality requirement in the employee handbook. *See Wyman Gordon Pa.*, 368 N.L.R.B. No. 150 at 1 n.1. Nor did Wyman Gordon mention those two issues in its opening brief in this court, raising them instead for the first time in its reply brief. *Compare* Wyman Gordon Opening Br. at 3–4, 19–53, *with* Wyman Gordon Final Reply Br. at 3–4. Wyman Gordon similarly failed to object before the Board to the finding that it committed an unfair labor practice by not providing the health care benefits information requested by the Union on August 31, 2016.

When an objection has not been properly urged before the Board, we lack jurisdiction to consider it. 29 U.S.C. § 160(e); *accord Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–666 (1982). To properly present and preserve a claim, a party's exception to an ALJ finding must fairly put "the Board on notice of the specific grounds for its objections." *Nova Se. Univ. v. NLRB*, 807 F.3d 308, 313 (D.C. Cir. 2015). Here, Wyman Gordon made no exceptions at all to the unfair labor practice findings related to the termination of light work or the improper employee confidentiality requirement. As to the Union's request for health care information, Wyman Gordon's exceptions were the very definition of conclusory—excepting only to the ALJ's findings without a word of explanation as to why those findings were supposedly incorrect. Simply saying "I object," without explaining why, is not sufficient to fairly present and preserve an issue before

the Board. Parties cannot expect the Board to make the arguments for them. *Cf. Davis v. Pension Benefit Guar. Corp.*, 734 F.3d 1161, 1166–1167 (D.C. Cir. 2013) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (quoting *Consolidated Edison Co. of N.Y., Inc. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007); formatting modified).[1]

For those reasons, the Board is entitled to summary enforcement of the portions of its order finding unfair labor practices based on the confidentiality requirement in Wyman Gordon's employee handbook, the termination without bargaining of the light-duty work offered to employees on workers' compensation, and Wyman Gordon's failure to respond to the Union's August 31st request for health care benefits information.

## III

The Board's conclusions that Wyman Gordon violated Sections 8(a)(5) and (1) of the Act by (i) not negotiating before postponing the August 1st wage increase, (ii) failing to provide the quarterly-bonus and product-pricing information requested by the Union on August 12th and September 6th, respectively, and (iii) unilaterally withdrawing recognition from the Union, are each reasoned, consistent with precedent, and supported by substantial evidence.

## A

Wyman Gordon violated Sections 8(a)(5) and (1) of the Act when it failed to bargain with the Union before postponing the annual August 1st wage increase. It is quite debatable whether Wyman Gordon adequately preserved this issue. A party excepting to an ALJ's findings must provide "authorities and argument in support of the exceptions," 29 C.F.R. § 102.46(a)(1)(i)(D), and the Board is authorized to "disregard[]" any exception that "fails to comply" with this requirement. *Id*. § 102.46(a)(1)(ii); *see Nova Se. Univ.*, 807 F.3d at 313. Wyman Gordon's exception objected only "[t]o the judge's finding that 'employees had not granted [sic] a wage increase on August 1, as in past years without bargaining with the Union about the increase.'" J.A. 482. The "argument" in its accompanying brief seemingly undermined the exception by acknowledging that Wyman Gordon first gave notice of its intent to bargain after, not before, the August 1st suspension. *See* J.A. 505.

To the extent that Wyman Gordon might have preserved the point by arguing that late notice suffices for a wage increase as long as the employer intends to provide it retroactively, *see* J.A. 505, that argument lacks merit. During the negotiation of a collective bargaining agreement, an employer generally may not unilaterally discontinue its existing employment practices unless

---

[1] Nor do we allow parties to raise arguments for the first time in reply briefs. *Dodge of Naperville, Inc. v. NLRB*, 796 F.3d 31, 41 (D.C. Cir. 2015) ("[W]e do not consider arguments raised for the first time on reply[.]"); *Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990) ("We require petitioners and appellants to raise all of their arguments in the opening brief to prevent 'sandbagging' of appellees and respondents and to provide opposing counsel the chance to respond.").

the employer and the union have first bargained to impasse. *See Daily News of L.A. v. NLRB*, 73 F.3d 406, 412 (D.C. Cir. 1996) ("Because the disputed [annual merit-based wage-increase] program was a mandatory subject of bargaining, the employer could not terminate the pay plan without first bargaining to impasse with the Union."); *Stone Container Corp.*, 313 N.L.R.B. 336, 336 (1993). But when, as here, a discrete, recurring event is scheduled to occur during negotiations for a first collective bargaining agreement, all that Board precedent requires is that the employer "announce *in advance* that it plans to make changes as to that event." *TXU Elec. Co.*, 343 N.L.R.B. 1404, 1407 (2004) (emphasis added). Importantly, that notice must come far enough in advance to afford the union a reasonable "opportunity to bargain as to those matters[.]" *Id*. After that, "the employer can carry out the changes[.]" *Id.*

Wyman Gordon failed to clear even that low bar. The ALJ found that Wyman Gordon failed to raise the matter of the upcoming annual wage increase with the Union at all prior to its suspension, let alone provide sufficient notice to the Union to permit negotiations over either the wage increase or its postponement. **[J.A. 23]**. The proof comes straight from Wyman Gordon's mouth: It stated twice in its briefing before this court that it first began negotiations over the wage increase on August 12, 2016, instead of reasonably in advance of the August 1st suspension. Wyman Gordon's Opening Br. at 9, 24.

Wyman Gordon argues that because it bargained with the Union after August 12, 2016, and because the employees eventually received a retroactive fifteen-cent wage increase in January 2017, the Board erred in finding that it violated the Act. Wyman Gordon's starting premise—that the retroactive payment made the employees whole, and so no harm, no foul—is dubious. For example, there was no evidence that Wyman Gordon paid interest on the delayed wages. *See* Transcript of Oral Argument at 10:4–11. The argument also completely misses the point. The ALJ distinctly found that the company had violated the Act because, having chosen not to pay the wage as it had before, Wyman Gordon failed to provide the Union any advance notice that it would suspend the established wage increase. *See Wyman Gordon Pa.*, 368 N.L.R.B. No. 150 at 23. Delayed payment does not cure the notice violation.

Wyman Gordon's separate argument that the timing of its notification to the Union about the wage increase was not before the Board is also meritless. The Union's consolidated complaint specifically alleged that Wyman Gordon failed to grant the wage increase "without prior notice to the Union[.]" S.A. 15.

**B**

Under Section 8(a)(5) of the Act, an employer has a duty to bargain collectively with the employees' chosen representative. *Teachers College, Columbia Univ. v. NLRB*, 902 F.3d 296, 301 (D.C. Cir. 2018). Under long-settled law, that obligation includes a duty "to supply a union with requested information that will enable [the union] to negotiate effectively and to perform properly its other duties as a bargaining representative." *Id.* (quoting *Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*, 711 F.2d 348, 358 (D.C. Cir. 1983); formatting modified).

That requirement extends only to information that is relevant to the negotiation process and

that will enable the Union to carry out its statutory duties and responsibilities. *Oil, Chem. & Atomic Workers*, 711 F.2d at 359. Information relating to the bargaining unit employees' wages, hours, and conditions of employment is presumptively relevant. *Teachers College*, 902 F.3d at 302. To rebut the presumption, an employer must make an affirmative showing that the requested information either lacks relevance or cannot, in good faith, be provided by the employer. *Prime Healthcare Services—Encino LLC v. NLRB*, 890 F.3d 286, 295 (D.C. Cir. 2018); *Hondo, Inc.*, 311 N.L.R.B. 424, 425 (1993).

On the other hand, information that is "not ordinarily pertinent to collective bargaining" is presumptively not relevant, and the union bears the burden of proving otherwise. *Oil, Chem. & Atomic Workers*, 711 F.2d at 359 (quoting *Press Democrat Publ'g Co. v. NLRB*, 629 F.2d 1320, 1324 (9th Cir. 1980)).

The Union's August 12th request for information about the formula for calculating employees' quarterly cash bonuses was plainly relevant. Bonuses, like wages, fall within the category of presumptively relevant information. *United States Info. Servs., Inc. & Communications Workers, AFL-CIO*, 341 N.L.R.B. 988, 988, 992–993 (2004) (affirming ALJ's finding that bonuses are presumptively relevant because of their similarity to wages); *see NLRB v. Laredo Coca Cola Bottling Co.*, 613 F.2d 1338, 1343 (5th Cir. 1980) (holding that a regular Christmas bonus was a "term[] and condition[] of employment" because it was a routinized benefit).

Wyman Gordon argues that, because the quarterly cash bonuses involved some non-unit employees, the information was not presumptively relevant. Even assuming that argument makes legal sense, the Union sufficiently explained the information's relevance: The information was needed to understand how quarterly cash bonuses were calculated to ensure informed bargaining over future bonuses and the protection of employees' rights. *See* J.A. 1277 (letter from Union to Wyman Gordon requesting quarterly cash bonus information to better understand Wyman Gordon's compensation practices); J.A. 1397 (email from Union to Wyman Gordon stressing need for quarterly cash bonus formula, because "the description contained in the handbook is not adequate for us to understand the * * * precise nature of the input data").

The Union's separate request for five categories of information bearing on the company's internal pricing of its top revenue-generating products was also proper. That request arose from the statement by Wyman Gordon's chief negotiator during collective bargaining that the company could not support a wage increase because "no customer would understand a 15% price increase[.]" *Wyman Gordon Pa.*, 368 N.L.R.B. No. 150 at 7.

While such product-pricing information is not presumptively relevant, the Board reasonably concluded that the Union had met its burden of demonstrating relevance. As the Board has long held, "an employer's duty to bargain includes a general duty to provide information needed by the bargaining representative to assess claims made by the employer relevant to contract negotiations." *Caldwell Mfg. Co.*, 346 N.L.R.B. 1159, 1159 (2006); *see KLB Indus., Inc. v. NLRB*, 700 F.3d 551, 559 (D.C. Cir. 2012) (holding that "a union * * * does not have to accept the employer's bald assertions or generalized figures at face value") (quoting *E.I. Du Pont de Nemours*

*& Co. v. NLRB*, 489 F.3d 1310, 1316 (D.C. Cir. 2007); formatting modified). Requests for information bearing on claims made by the employer during bargaining are relevant if they target "the accuracy of [an employer's] specific claims" and allow the union "to respond appropriately with counterproposals." *Arlington Metals Corp.*, 368 N.L.R.B. No. 74 at 4 (2019) (citation omitted); *see KLB Indus., Inc.*, 700 F.3d at 557 (holding that a union's information request was valid when it was tailored to the employer's specific and repeated statements about its lack of competitiveness).

Because Wyman Gordon specifically connected a raise for employees with a corresponding increase in customer prices, the Union's request for information that would concretely demonstrate the nature of any connection between wages and prices was directly relevant both to the bargaining process and to the ability of the Union to tailor its proposals to the company's concerns.

Wyman Gordon counters that the Board's decisions do not require an employer to open its books to a union just because of a claimed concern about remaining competitive. But the Board made no such sweeping ruling. The Board did not hold that Wyman Gordon needed to throw open all of its books to the Union, and it made no finding that Wyman Gordon had asserted an inability to pay and remain competitive. *See Wyman Gordon Pa.*, 368 N.L.R.B. No. 150 at 7 ("[T]he General Counsel does not allege, and the judge did not find" that Wyman Gordon claimed an inability to pay.). Instead, the Board held that the targeted information the Union sought was relevant to the company's specific claim that a wage increase would cause a 15% price increase for customers. Because the Union's information request was tailored to Wyman Gordon's proffered justification for resisting a wage increase, the information was relevant to the negotiations.

## C

Under Section 8(a)(5) of the Act, an employer must recognize and bargain with the labor organization that its employees have properly chosen. *Pacific Coast Supply, LLC v. NLRB*, 801 F.3d 321, 325 (D.C. Cir. 2015). Once a union is recognized, it enjoys a continuing presumption of majority support by employees. *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 786 (1996). Yet when, as here, the union has been the collective bargaining representative of the employees for over a year, that presumption can be rebutted by an employer. *Id.* The burden, though, is on the employer to establish a loss of majority employee support before withdrawing recognition of a union. *Pacific Coast Supply*, 801 F.3d at 326 ("[A]n employer may not 'withdraw recognition unless it can prove that an incumbent union has, in fact, lost majority support.'") (quoting *Levitz Furniture Co. of the Pac.*, 333 N.L.R.B. 717, 723 (2001)).

The "'preferred method'" for an employer to determine if a union has lost the support of the employees it represents is to request that the Board conduct a Representation Management election, "in which employees cast confidential votes for or against the union." *Pacific Coast Supply*, 801 F.3d at 326 (quoting *Levitz*, 333 N.L.R.B. at 727); *see also* 29 U.S.C. § 159(e)(1). To obtain such an election, the employer need demonstrate only "'a reasonable good-faith uncertainty' as to the union's continuing majority status." *Pacific Coast Supply*, 801 F.3d at 326 (quoting *Levitz*, 333 N.L.R.B. at 723).

Alternatively, an employer can choose a more risky route and, "at its peril," unilaterally withdraw recognition if presented with evidence of an asserted loss of majority support. *Levitz*, 333 N.L.R.B. at 725; *accord Pacific Coast Supply*, 801 F.3d at 326. If the union disputes the ground for withdrawal, the employer must prove by a preponderance of the evidence "that the union had, in fact, lost majority support at the time [it] withdrew recognition." *Levitz*, 333 N.L.R.B. at 725. Because the loss of majority support must exist at the time the employer withdrew support, an employer may rely only on evidence that it had at that critical time. *See Pacific Coast Supply*, 801 F.3d at 333–334. Failure by the employer to meet its burden of proof renders the withdrawal of recognition an unlawful labor practice in violation of Sections 8(a)(5) and (1) of the Act.

In this case, Wyman Gordon relied solely on the petition presented to it by the National Right to Work Legal Defense Foundation on November 23, 2016, as its reason for withdrawing recognition. And the Board's conclusion that the Foundation's petition did not pass evidentiary muster was supported by substantial evidence. Only nine employee signatures appeared on the first and last pages of the petition, which included language identifying the document as a union decertification petition. Fourteen of the employee signatures were strewn in a haphazard manner across three pages that were just a collection of lines without any information explaining what the document was. The Board reasonably determined that this disjointed collection of signatures did not constitute objective evidence of the employees' actual intent to withdraw from the Union.

Wyman Gordon argues that there was other evidence in the record to corroborate the loss of majority support. But that evidence is off-limits because Wyman Gordon was not aware of it at the time of its decision to withdraw recognition. It is at best a *post hoc* rationale. When deciding whether an employer's withdrawal of recognition was lawful, the Board cannot consider evidence that the employer learned of only after the fact. *See Highlands Hosp. Corp. v. NLRB*, 508 F.3d 28, 32 (D.C. Cir. 2007) (refusing to credit testimony because the employer "had no knowledge of that corroborating evidence on the day it withdrew recognition"); *see also Pacific Coast Supply*, 801 F.3d at 333–334. Here, the Board found as a matter of fact that Wyman Gordon relied only on the petition, and so the Board properly refused to consider other testimony.

Wyman Gordon's remaining arguments are on even shakier ground. First, Wyman Gordon contests the ALJ's credibility findings, which the Board sustained. Yet only the most extraordinary showing would allow this court to upset credibility findings made by the ALJ and affirmed by the Board. *Inova Health System v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015) ("[W]e accept all credibility determinations made by the ALJ and adopted by the Board unless those determinations are 'patently insupportable.'") (quoting *Traction Wholesale Center Co. v. NLRB*, 216 F.3d 92, 99 (D.C. Cir. 2000)). Wyman Gordon's arguments do not come close to that mark.

Second, Wyman Gordon argues that the ALJ "conveniently" ignored the testimony of Tim Brink, an Area Manager at the Wyman Gordon facility, who stated that he recognized all the signatures on the petition for withdrawal as belonging to unit employees. That argument is off-base. The Board never ruled that the signatures on the petition were forged. It instead held only that there was no objective evidence that a majority of the signatories knew that what they were signing was a decertification petition. Tim Brink's testimony had nothing to say about that.

Lastly, Wyman Gordon argues that it relied not only on the petition, but also on "the context within which the petition was received," pointing out that the Union was elected as the employees' bargaining representative by only one vote. Wyman Gordon Opening Br. 46. But the Union enjoyed a legal presumption of majority status, regardless of the margin of votes by which it was elected. *See Auciello Iron Works*, 517 U.S. at 786.

## IV

Finally, Wyman Gordon challenges the Board's imposition of an affirmative-bargaining order. We can overturn the remedy imposed by the Board only if Wyman Gordon shows that the remedy "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Elec. & Power*, 319 U.S. at 540.

Because an affirmative-bargaining order takes the "extreme" step of requiring an employer to bargain with a union without challenging its majority support, the Board must balance three factors before imposing such an order. *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 738 (D.C. Cir. 2000). Those factors are: "(1) the employees' [Section] 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act." *Id*.

In this case, the Board adequately considered and balanced those factors. First, an affirmative-bargaining order would vindicate the employees' Section 7 rights because it would finally provide the Union a fair environment in which to negotiate for an initial collective bargaining agreement. The employees at all times had "the right * * * to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Wyman Gordon's employees chose the Union as their representative, and the bargaining order enables the Union to negotiate with Wyman Gordon as the employees intended.

Second, no other purpose of the Act outweighs that substantial interest in this case. Affirmative-bargaining orders last only for a "reasonable period of time," *Wyman Gordon Pa.*, 368 N.L.R.B. No. 150 at 11, which generally does not exceed one year. *See Sullivan Indus. v. NLRB*, 957 F.2d 890, 903 n.5 (D.C. Cir. 1992) ("The decertification bar would last for a 'reasonable period'—at least six months, perhaps as much as one year—during which time the employer and the union would presumably bargain."). Such a reasonable period of time is necessary to allow the Union to reestablish its relationship with workers and to attempt to negotiate a collective bargaining agreement unburdened by the unfair labor practices committed by Wyman Gordon. The Board added that, rather than undermine employees' statutory rights, its affirmative-bargaining order would serve the Act's purpose of promoting industrial peace by decreasing Wyman Gordon's incentive "to delay bargaining in the hope of discouraging support for the Union." *Wyman Gordon Pa.*, 368 N.L.R.B. No. 150 at 11.

Third, an alternative remedy would not be sufficient to remediate Wyman Gordon's many violations of the Act. Given that four years have gone by since the employees elected the Union as their collective bargaining representative with Wyman Gordon, Transcript of Oral Argument at 11:22–12:8, the Board sensibly determined that the Union needs the opportunity "to reestablish its

representative status with the unit employees," and so an alternative remedy—like another Union election or a simple cease-and-desist order—would be "inadequate," *Wyman Gordon Pa.*, 368 N.L.R.B. No. 150 at 11; *see Veritas Health Servs., Inc. v. NLRB*, 895 F.3d 69, 87, 89 (D.C. Cir. 2018) (sustaining affirmative-bargaining order to remedy an unlawful withdrawal of recognition).

Wyman Gordon argues that the Board should allow a decertification election. But if that is what the company wanted, it could have asked for such an election from the Board when first presented with the petition, rather than unilaterally withdrawing recognition based on such an unreliable document. Perhaps Wyman Gordon now has buyer's remorse for the path it chose. But the Board was under no obligation to relieve it of the consequences of its voluntary choice to proceed "at its peril," *Levitz*, 333 N.L.R.B. at 725. Indeed, doing so would turn the disfavored practice of unilateral withdrawal of recognition into a cost-free option for employers.

In sum, the Board reasonably concluded that all three factors weigh in favor of imposing an affirmative-bargaining order on this record.

## V

For all of those reasons, we dismiss the portion of Wyman Gordon's petition for review disputing the Board's finding that the company's failure to respond to the Union's August 31st request for health care information was an unfair labor practice; we deny the petition in all other respects; and we grant the Board's cross-application for enforcement in full.

**The Clerk is directed to withhold issuance of the mandate until seven days after resolution of any timely petition for rehearing or rehearing *en banc*. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41(b).**

FOR THE COURT:
Mark J. Langer, Clerk

BY: /s/
Daniel J. Reidy
Deputy Clerk